John A. **GENTILE**, Victoria S. Cashman, Bradley T. Martin, John Knight, and Dyad Partners, LLC, Plaintiffs Below, Appellants,

v.

Pasquale David **ROSSETTE**, Douglas W. Bachelor, and LeaseNet Group, Inc., an Ohio Corporation, as successor by merger to LeaseNet Group, Inc., a Delaware corporation, Defendants Below, Appellees.

No. 573, 2005.

Supreme Court of Delaware.

Submitted: April 26, 2006.
Decided: Aug. 17, 2006.

---

24. *McNulty v. State*, 655 A.2d 1214, 1217 (Del.1995).

David A. Jenkins (argued), Joelle E. Polesky, Robert K. Beste, III, and Michele C. Gott, Esquires, of Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; John L. Reed, Esquire, of Edwards & Angell Palmer & Dodge, LLP, Wilmington, Delaware; for Appellants.

Jesse A. Finkelstein, Raymond J. DiCamillo and Michael R. Robinson, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Sean T. Carnathan (argued) and Alan J. Langton II, Esquires, of O'Connor, Carnathan and Mack LLC, Burlington, Massachusetts; for Appellees.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice.

The plaintiffs, who are former minority shareholders of SinglePoint Financial, Inc. ("SinglePoint" or "the company"), appeal from a grant of summary judgment by the Court of Chancery dismissing their claim for breach of fiduciary duty against Single-Point's former directors and its CEO/controlling stockholder. The claim arises from a self-dealing transaction in which the CEO/controlling stockholder forgave the corporation's debt to him, in exchange for being issued stock whose value allegedly exceeded the value of the forgiven debt. The transaction, it is claimed, wrongfully reduced the cash-value and the voting power of the public stockholders' minority interest, and increased correspondingly the value and voting power of the controller's majority interest. After the debt conversion, SinglePoint was later acquired by another company ("Cofiniti") in a merger. Shortly thereafter, the acquirer, Cofiniti, filed for bankruptcy and was liquidated. The plaintiffs then brought this action in the Court of Chancery, seeking to recover the value of which they claimed to have been wrongfully deprived in the debt conversion. The Court of Chancery dismissed the action on the ground that the claim was exclusively derivative, and that as a result of the Cofiniti merger the plaintiffs had lost standing to assert the claim on behalf of SinglePoint.

The issue presented on this appeal is one purely of law: can SinglePoint's former minority stockholders bring a direct claim against the fiduciaries responsible for the debt conversion transaction complained of, or is such a claim exclusively derivative? We hold, for the reasons discussed herein, that the claim is not exclusively derivative and can be brought by the (former) minority shareholders directly. We must, therefore, reverse the contrary ruling of the Court of Chancery.

## I. FACTS[1]

In 1995, plaintiff John A. Gentile and defendant Douglas W. Bachelor, who were acquaintances and co-workers, discussed creating a new software company. Late that year, Gentile and Bachelor presented the idea to Pasquale David Rossette, a childhood friend of Gentile, who agreed to provide the initial investment. Ultimately, Gentile, Rossette, and Bachelor formed the company that came to be known as Single-Point—a high technology financial services company that supported financial advisors and their clients with the ability to manage assets online. During its relatively short existence, SinglePoint was unable to develop a commercially viable product or produce significant revenues. Faced with significant financial difficulties throughout its existence, SinglePoint turned to Rossette, who was the company's sole source of additional capital, for financial assistance on several occasions.

Gentile, Rossette and Bachelor served as SinglePoint's initial directors. Gentile was SinglePoint's first President and Chief Executive Officer, and Bachelor was its Chief Technology Officer. When Single-Point encountered difficulties, it relied on Rossette for more funding. In 1998, after providing several cash infusions for the company, Rossette insisted that Gentile be replaced as President before he (Rossette) would supply any more funding. Gentile's replacement, Christopher McGrath, resigned less than one year later, and Bachelor became the new CEO. SinglePoint's financial woes continued, however, and in April 1999, Rossette decided to take over as CEO, a position he held for the remainder of SinglePoint's existence.

By March 2000, Rossette had advanced over $3 million to SinglePoint. As consid-eration for those loans, Rossette received promissory notes that were convertible into shares of SinglePoint common stock. As provided in the governing Stock Purchase Agreement, the original conversion rate was $1.33 of debt per share. On November 1, 1999, the conversion rate was reduced to $0.75 of debt per share, and on October 23, 1999, the conversion rate was reduced to $0.50 of debt per share.

Before March 2000, SinglePoint's capital structure consisted principally of almost 6 million outstanding shares of common stock, plus over $3 million of debt owed to Rossette. By March 2000, Rossette concluded that the level of the company's debt to him was deterring third party investment in SinglePoint. Accordingly, Rossette decided to convert all but $1 million (about 2/3) of his SinglePoint debt into equity. The resulting debt conversion transaction is what gave rise to the plaintiffs' claim for breach of fiduciary duty.

At the time of the debt conversion, Rossette and Bachelor were SinglePoint's only two directors. Bachelor and Rossette negotiated the terms of the conversion, with Rossette purporting to represent himself individually, and Bachelor purporting to represent the company. Disregarding the contractual conversion rate of $0.50 of debt per share then in effect, Rossette and Bachelor agreed to a significantly lower conversion rate—$0.05 of debt per share. They next convened a board meeting (as the company's sole directors), and in that capacity they agreed that $2,220,951 of Rossette's debt would be converted into SinglePoint equity at the $0.05 per share rate. On that basis, Rossette would receive over 44 million shares of SinglePoint common stock—40 million shares more than he would have received under the

1. The facts recited here, all supported by the record, are adopted primarily from the Court of Chancery's opinions in this action and an earlier statutory appraisal action.

contractual conversion rate of $0.50 per share.

Because the proposed debt conversion required issuing more shares of common stock than were currently authorized, a special shareholders meeting was held to amend SinglePoint's certificate of incorporation. The shareholders were informed of the proposal to authorize additional shares, but were not informed of the underlying purpose—to convert over $2.2 million of the Rossette debt to equity. At the March 27, 2000 special shareholders meeting, the shareholders approved an increase of authorized shares of SinglePoint common stock from 10 million to 60 million shares, thereby enabling the conversion to occur. Before the conversion, Rossette held approximately 61.19% of the company's equity; after the conversion, he held 93.49%.[2] As a result, the minority shareholders' interest was reduced correspondingly, from 38.81% to 6.51%.

After the debt conversion, SinglePoint began searching for an acquirer. In May 2000, only two months later, Rossette negotiated a merger with Cofiniti (SinglePoint's only direct competitor) in which Cofiniti would acquire SinglePoint. Under the agreed-upon merger terms, SinglePoint shareholders would receive approximately 0.49 shares of Cofiniti common stock for each share of SinglePoint common stock, and SinglePoint would become a wholly-owned subsidiary of Cofiniti.

To secure Rossette's approval of the merger, Cofiniti offered Rossette unique benefits. That did not occur fortuitously. Rossette made it clear that "for me to accept the terms and conditions of the Merger as set forth they [Cofiniti] would have to provide me the proper inducement to do so." The side benefits offered to Rossette included a put agreement requiring Cofiniti, after one year, to repurchase 360,000 shares of Cofiniti stock that Rossette had received in the merger, at $5 a share, for a total of $1.8 million. That put agreement had significant value, because Cofiniti's stock had no public market and, therefore, could not easily be sold. No other stockholder of SinglePoint was afforded similar "side benefit" treatment.

On October 13, 2000, SinglePoint issued an Information Statement informing shareholders of the upcoming merger with Cofiniti. The shareholders were told that "approval of the merger is assured because several of our large stockholders, representing in the aggregate approximately 96.8% of our outstanding common stock, have agreed to vote their shares in favor of the merger." The Information Statement further disclosed that Rossette had converted over $1 million of the debt the company owed him into SinglePoint stock. The Information Statement did not disclose that the actual amount of the converted debt was over $2.2 million, or the number of shares that were issued to Rossette in the debt conversion, or at what price. Nor did the Information Statement disclose the put agreement that Rossette had received from Cofiniti, or that the put agreement was what induced his approval of the merger, or that one year after the merger Rossette would receive $1.8 million. The merger was approved by a majority of the minority shareholders. The plaintiffs did not consent to, nor did they vote for, the merger, which closed on October 23, 2000.

Within 18 months of the merger, Cofiniti was fatally undone by many of the same

**2.** In their briefing, the defendants note that the 93.49% figure is erroneous, and point out that Rossette actually held 95.45% of SinglePoint after the debt conversion. Because the error does not affect the analysis employed here and for consistency, we adopt the 93.49% figure used by the Court of Chancery.

problems that had afflicted SinglePoint. On March 11, 2002, Cofiniti was forced to file for bankruptcy and, ultimately, to liquidate.[3]

Almost one year earlier, on February 15, 2001, the plaintiffs brought an appraisal action in the Court of Chancery, seeking a determination of the fair value of their SinglePoint stock at the time of the Cofiniti merger. The Court of Chancery determined that the fair value of SinglePoint's common stock was $5.51 a share—110 times the per-share value ascribed to those SinglePoint shares in the debt conversion. The Court of Chancery refused, however, to entertain the minority stockholders' claims that their shares had been improperly diluted by the issuance of excessive shares to Rossette in the debt conversion. That dilution claim, the Court held, was not cognizable in an appraisal proceeding, because the claim was not one for waste that belonged to (and thus would be treated as an asset of) the corporation:

> I also reject the Petitioners' arguments to the extent that they attempt to recharacterize the Share Dilution Claim as a claim for corporate waste, and thereby have the value of such a derivative claim added into the total enterprise value of SinglePoint as an asset of the Company.... The Petitioners cannot escape the rule and policy concerns set forth by the Supreme Court in *Cavalier Oil* by merely switching the label on what, in essence, is a claim for share dilution.[4]

On March 27, 2003, the plaintiffs commenced this breach of fiduciary duty action in the Court of Chancery challenging (in Count I) the debt conversion as an improper extraction of the economic value and voting power from their minority interest, and (in Count II) the unique "put" benefits Rossette had received to induce his approval of the Cofiniti merger. The defendants moved for summary judgment on the ground that the plaintiffs' claims were derivative in nature, and that as a result of the Cofiniti merger the plaintiffs had lost standing to bring those claims. The defendants also argued that they were entitled to judgment as a matter of law on the substantive merits of the plaintiffs' claims. In a decision handed down on October 20, 2005, the Court of Chancery dismissed the plaintiffs' debt conversion claim (Count I). The Court held (somewhat inconsistently with its ruling in the appraisal action) that the claim was derivative and that the plaintiffs had lost standing to raise it.[5] Thereafter, the Court of Chancery granted the plaintiffs' motion to certify an interlocutory appeal from its order dismissing the debt conversion claim. This Court accepted that interlocutory appeal.

## II. THE COURT OF CHANCERY DECISION

In its October 20, 2005 opinion,[6] the Court of Chancery held that the debt conversion claim was derivative, and that as a result of the 2000 merger with Cofiniti, the plaintiffs were no longer SinglePoint shareholders with standing to assert the corporation's claim. The Court held that the dilution claim was derivative, because "when a 'board of directors authorizes the issuance of stock for no or grossly inade-

---

3. Rossette's put agreement was also canceled.

4. *Gentile v. SinglePoint Fin., Inc.*, 2003 WL 1240504, *5 n. 35 (Del.Ch.) (referring to *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816 (Del. Ch.), *aff'd*, 564 A.2d 1137 (Del.1989)).

5. The Court did not address the merits of the Count I claims. It did, however, address the merits of the claims alleged in Count II, and denied summary judgment on those claims.

6. *Gentile v. Rossette*, 2005 WL 2810683 (Del. Ch.).

quate consideration, the corporation is directly injured and shareholders are injured derivatively ... [and that] mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one.' " [7] Although the Court of Chancery acknowledged that a share dilution claim may be brought as a direct claim where voting rights are harmed because of the dilution,[8] it held that, to give rise to a direct claim, the dilution must result in a "material decrease" in voting power. Here, the Vice Chancellor held, there was no "material" decrease in voting power, because the plaintiffs were minority shareholders of SinglePoint both before and after the debt conversion.

The trial court reasoned that the gist of the plaintiffs' debt conversion claim was that SinglePoint was caused to sell its shares too cheaply, and as a result was deprived of the opportunity to sell those shares for a better price.[9] Because that loss of opportunity was suffered only by the company, and because any remedy—either to cancel the "excess" shares issued to Rossette or to require Rossette to restore their fair value—would benefit only the company, the claim was derivative under the analysis mandated by *Tooley v. Donaldson, Lufkin & Jenrette, Inc. ("Tooley")*.[10] Accordingly, the Court of Chancery granted summary judgment dismiss-

ing the plaintiffs' debt conversion claim. On appeal from a grant of summary judgment, our review is *de novo*.[11]

## III. *THE PARTIES' CONTENTIONS*

This appeal concerns only the grant of summary judgment dismissing the claim for breach of fiduciary duty arising out of the debt conversion.[12] The issue that we must decide is whether that claim was *exclusively* derivative in character. If it was, then the summary judgment grant must be affirmed; if not, then the summary judgment must be reversed.

■ The defendant-appellees argue that the plaintiffs' debt conversion fiduciary duty claim is exclusively derivative, and that the Vice Chancellor correctly so held. Under *Tooley*,[13] whether a claim is derivative or direct depends solely upon two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?"[14]

Here, the defendants maintain, the only harm arguably resulting from the debt conversion was to the corporation, because in essence, the debt conversion claim is that SinglePoint was caused to overpay for the debt forgiveness. More specifically, the claim is that the debt conversion rate

7. *Id.* (quoting *In re J.P. Morgan Chase & Co. S'holders Litig.*, 2005 WL 1076069, at *6 (Del. Ch.)).

8. *Id.* (citing *Oliver v. Boston Univ.*, 2000 WL 1091480 (Del.Ch.)).

9. *Id.* at *5.

10. 845 A.2d 1031 (Del.2004).

11. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1219 (Del.1999); *Stroud v. Grace*, 606 A.2d 75, 81 (Del.1992).

12. The Court of Chancery held that the Count II claims alleging breach of fiduciary duty in connection with the Cofiniti merger were direct claims, but denied summary judgment, because the Court was unable to conclude that on the undisputed facts the defendants were entitled to judgment as a matter of law. No party has appealed from the Count II determinations.

13. 845 A.2d 1031 (Del.2004).

14. *Id.* at 1033.

($.05 per share) was unfair and resulted in SinglePoint issuing "vastly more stock [to Rossette] than it should have."[15] No harm from that overpayment resulted to any stockholder individually (defendants argue), because to the extent the overpayment invalidly increased the number of outstanding shares, the resulting dilution affected each and all of the pre-debt conversion shares identically—including the shares owned by Rossette. Moreover, defendants assert, whatever form any damages recovery or other remedy might take—whether it be to cancel the "excess" shares or to require the acquirer to pay their fair value—the only beneficiary of that remedy would be the company. Lastly, defendants contend that to the extent the plaintiffs' claim is for wrongful dilution of their voting power, restoration of that voting power is no longer possible because, as a result of the Cofiniti merger and the Cofiniti bankruptcy, for all practical purposes SinglePoint and Cofiniti no longer exist.

The defendants concede that a "stock dilution" claim may be brought as a direct claim if voting rights are harmed. They insist, however, that that can only occur where the loss of voting power is "material." The defendants conclude that the Court of Chancery correctly found that the plaintiffs never had any material voting power to lose, because both before and after the debt conversion, the public shareholders of SinglePoint held only a minority interest.

The plaintiffs vigorously contest these arguments. They claim that under *Tooley* their claim is direct, for two alternative reasons. First, their debt conversion claim cannot be derivative because only the shareholder minority—but not the corporation—was injured. The reason (plaintiffs say) is that the company was insolvent, and therefore suffered no harm by issuing its valueless stock to expunge a sizeable portion of its debt to Rossette.[16] But, even if economically worthless, the SinglePoint stock did have voting power, and the debt conversion reduced the minority shareholders' ownership percentage, and voting power, from about 39% to 7%. Moreover, because of the significant (over 80%) reduction in their share ownership percentage, the minority stockholders also suffered a corresponding reduction of the proceeds they would have otherwise received in the Cofiniti merger. The plaintiffs contend that because SinglePoint no longer exists, only the former minority stockholders can benefit from a judicial remedy. The only remedy now available would be a recovery of the fair value of the Cofiniti merger proceeds the plaintiffs would have received but for the extraction of value resulting from the debt conversion. Any such recovery would benefit only the (former) SinglePoint minority.

**15.** *Gentile v. Rossette*, 2005 WL 2810683, at *4 (Del.Ch.) (quoting Pls.' Opening Br. at 12).

**16.** To the extent the plaintiffs argue that SinglePoint was not harmed by the debt conversion, their position is at war with itself and fatally flawed. The plaintiffs cannot argue, for purposes of demonstrating a lack of harm to the corporation, that the SinglePoint stock was worthless, yet simultaneously contend that that same stock had value for purposes of establishing that the debt conversion at the $0.05 rate was unfair to the corporation. Indeed, the Court of Chancery's $5.50 per share appraisal award would appear to defeat that argument. Accordingly, we reject the plaintiffs' "no value" contention, and proceed from the premise that the SinglePoint stock had value. From that premise it follows that, to the extent SinglePoint was caused to issue an excessive amount of shares, the corporation was harmed by the debt conversion. Even so, we conclude, for the reasons set forth in Part IV, *infra*, of this Opinion, that the debt conversion claim is not exclusively derivative, and could have been brought either directly or derivatively.

Second, and alternatively, the plaintiffs contend that their claim is direct under *In re Tri–Star Pictures, Inc. Litigation*.[17] Their argument runs as follows: even if the SinglePoint shares had value, the debt conversion was a self-dealing corporate transaction with a significant stockholder, that increased the voting power and economic value of that significant stockholder's interest in SinglePoint, at the expense and to the corresponding detriment of the minority shareholders. The plaintiffs claim that the Court of Chancery erred by reading into *Tri–Star* a requirement that for such a transaction to give rise to a direct claim, the loss of voting power must be "material," *i.e.*, that it must reduce the public stockholders' voting power from majority to minority status. We conclude that the plaintiffs are correct and that *Tooley* and *Tri–Star*, properly applied, compel the conclusion that the debt conversion claim was both derivative and direct. It therefore was error to dismiss the claim on the basis that it was exclusively derivative.

## IV. ANALYSIS

### A. The Applicable Principles of Law

To analyze the character of the claim at issue, it is critical to recognize that it has two aspects. The first aspect is that the corporation (SinglePoint) was caused to overpay for an asset or other benefit that it received in exchange (here, a forgiveness of debt). The second aspect is that the minority stockholders lost a significant portion of the cash value and the voting power of their minority stock interest. Those separate harms resulted from the same transaction, yet they are independent of each other.

Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative. The reason (expressed in *Tooley* terms) is that the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow. In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock.[18] Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal "injury" to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.

There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character.[19] A breach of

---

17. 634 A.2d 319 (Del.1993) ("*Tri–Star*").

18. *See In re J.P. Morgan Chase & Co. S'holders Litig.*, 2005 WL 1076069, at *7 (Del.Ch.), *aff'd*, 2006 WL 585606, (Del.Supr.); *Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at *6 (Del.Ch.) (excessive exchange of stock); *Kramer v. W. Pac. Indus.*, 546 A.2d 348 (Del. 1988) (excessive issuance of stock options and payment of fees to executives).

19. It is legally possible for a claim to have such a dual character. As this Court has held, "Courts have long recognized that the same set of facts can give rise to both a direct claim and a derivative claim." *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del.1996).

fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[20] Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

■ But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.[21] In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

The above-described type of transaction was held to give rise to a direct claim in *In re Tri–Star Pictures, Inc.*[22] In that case, the plaintiffs, who were a class of former minority stockholders of Tri–Star Pictures, challenged an assets-for-stock transaction between Tri–Star and its largest stockholder, the Coca–Cola Company. Before the transaction, Coca–Cola (voting in concert with other significant stockholders aligned with it) held 56.6% of Tri–Star's common stock; the minority stockholders (the plaintiff shareholder class) held 43.4%. The plaintiffs alleged that Coca–Cola had wrongfully caused Tri–Star to issue an excessive number of Tri–Star shares to Coca–Cola in exchange for Coca–Cola assets having less value. As a result, Coca–Cola increased its stock interest in Tri–Star to about 80%, which in turn reduced the public shareholders' interest to approx-

---

**20.** *See Turner v. Bernstein*, 1999 WL 66532, at *11 (Del.Ch.) (a direct cash value dilution claim "arises only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder."); *see also In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del.Ch.); *Oli-*

ver v. Boston University, 2000 WL 1091480 (Del.Ch.).

**21.** Unlike the typical "overpayment" transaction, where the form of overpayment (cash or stock) does not matter, in this atypical type of transaction, the dual character of the harm, and of the claims resulting from that harm, arise where the overpayment takes the form of issued corporate stock.

**22.** 634 A.2d 319 (Del.1993).

imately 20%. This Court held that because Coca–Cola, as Tri–Star's largest stockholder, did not suffer a dilution of cash value, of voting power, or of ownership percentage to the same extent and in the same proportion as the minority shareholders, the plaintiffs had suffered an injury that was unique to them individually and that could be remedied in a direct claim against the controlling stockholder and any other fiduciary responsible for the harm.[23]

### B. Analysis of the Debt Conversion Claim

■ The plaintiffs contend that this case is functionally indistinguishable from, and thus is controlled by, *Tri–Star*. The defendants respond (and the Court of Chancery agreed) that *Tri–Star* does not control, because for a loss of voting power to give rise to a direct claim, the loss must be "material," meaning that the challenged transaction must reduce the holdings of the plaintiff class from majority to minority stockholder status[24]—a reduction that did not occur here.

Because the defendants do not claim that this case is distinguishable from *Tri–Star* in any other respect, the issue is a narrow one that may be stated thusly: where a *Tri–Star* type transaction reduces the voting power of the corporation's public shareholders, must the reduction be

from majority to minority stockholder status, for the public shareholders to have standing to assert a direct claim against the fiduciaries responsible? We hold that the answer is no. We so conclude for three separate reasons.

First, a requirement of a reduction from majority to minority status finds no support in our case law. The Court of Chancery cited no authority supporting that conclusion,[25] and nothing in *Tri–Star*, which created the analytical framework for this issue, compels it. In *Tri–Star*, Coca–Cola and the group of other stockholders with which Coca–Cola customarily voted as a bloc, were the corporation's majority stockholders. In *Tri–Star*, as here, the public stockholders held a minority interest, both before and after the challenged transaction. In both cases what was reduced was a significant portion of the economic value and voting power of that minority interest. In *Tri–Star* the minority interest was reduced from 43.4% to approximately 20%; here, the minority interest was reduced from approximately 39% to approximately 7%. None of the analysis in *Tri–Star* relating to whether the claim was direct or derivative turned on the extent or degree of the reduction of the minority interest. This case is, therefore, functionally indistinguishable from *Tri–Star*, and *Tri–Star*'s governing rule should control.

---

**23.** *Id.*, at 332–333.

**24.** *Gentile v. Rossette*, 2005 WL 2810683, at *5 ("As minority shareholders to begin with, Plaintiffs' voting power was not materially changed.").

**25.** The Court of Chancery cites only to *Oliver v. Boston Univ.*, 2000 WL 1091480 (Del.Ch.) for the proposition that "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims;" and to *Agostino v. Hicks*, 845 A.2d 1110, 1124 (Del.Ch.2004), summarizing its relevance as

"finding no cognizable loss of voting power where the plaintiffs held only a minority interest before the challenged transaction." Neither authority supports the "materiality" rule advanced by the Court of Chancery. The *Agostino* Court explicitly noted that the claim presented in that case was not a *Tri–Star* claim. And in *Oliver*, as here, the plaintiffs were minority stockholders before and after the challenged transaction. *But see infra* note 28 (discussing and overruling *Behrens v. Aerial Commc'ns, Inc.*, 2001 WL 599870 (Del. Ch.)).

Second, the requirement of a "material" reduction in voting power should play no part in any analysis of whether a claim is direct, derivative, or both. Such a requirement distracts from—and obscures— the nature of the harm inflicted upon the minority in a *Tri–Star* transaction, and denigrates the seriousness of the breach of fiduciary duty causing that harm. The *Tri–Star* type of transaction was found to be wrongful because it resulted in an improper extraction or expropriation, by the controlling shareholder, of economic value and voting power that belonged to the minority stockholders. The specific manner in which this was accomplished was causing the corporation to issue, to the controlling stockholder, shares having more value than the value of what the corporation received in exchange. The consequence was to increase the controlling stockholder's percentage of stock ownership at the expense of the minority.[26] The resulting reduction in economic value

and voting power affected the minority stockholders uniquely, and the corresponding benefit to the controlling stockholder was the product of a breach of the duty of loyalty well recognized in other forms of self-dealing transactions.[27] A rule that focuses on the degree or extent of the expropriation, and requires that the expropriation attain a certain level before the minority stockholders may seek a judicial remedy directly, denigrates the gravity of the fiduciary breach and condones overreaching by fiduciaries—at least in cases where the resulting harm to the minority falls below the prescribed threshold for "materiality." No principle of fiduciary law or policy justifies any condonation of fiduciary misconduct, even where the resulting harm is not "material" in the sense used by the trial court.

Third, the result reached here fits comfortably within the analytical framework mandated by *Tooley*.[28] Although the cor-

---

**26.** Our characterization of the harm giving rise to a direct claim in a *Tri–Star* type transaction is somewhat different from the articulation used by the *Tri–Star* Court itself. In *Tri–Star*, this Court articulated the harm to the minority in terms of a "dilution" of the economic value and voting power of the stock held by the minority. In this case, we adopt a more blunt characterization—extraction or expropriation—because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually, than does a description framed in terms of "dilution."

**27.** *See Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983) (discussing majority stockholder's duty of loyalty to minority in a going-private merger).

**28.** Although not cited by the trial court, the appellees draw our attention to a pre-*Tooley* decision by the Court of Chancery, *Behrens v. Aerial Communications, Inc.*, 2001 WL 599870 (Del.Ch.) which involved a transac-

tion virtually identical to the one complained of here. In *Behrens,* a majority (80%) stockholder caused the corporation to exchange $420 million of debt that the corporation owed the majority stockholder, for newly issued common shares in an allegedly unfair and self-dealing debt exchange transaction. The claim was that the newly issued stock constituted an overpayment for the debt forgiveness. The debt exchange was followed by a merger in which the corporation was acquired. The minority shareholders sued the majority stockholder and the corporation's former directors both directly and derivatively, claiming that the debt replacement transaction constituted a breach of fiduciary duty to the minority. The defendants moved to dismiss on the ground that that claim was derivative, and that its extinguishment by the merger deprived the (former) minority stockholders of standing to assert the claim. The Court of Chancery agreed, and dismissed the claim, ruling that (i) the claim was derivative, because any dilution resulting from the debt conversion overpayment affected all outstanding shares equally, and (ii) for that same reason the claim was not direct, because the

poration suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation.[29] The harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders.[30] Finally, in this specific case the sole relief that is presently available would benefit only the minority stockholders. Because SinglePoint no longer exists, there are no "overpayment" shares that a court of equity could cancel, and there is no corporate entity to which a recovery of the fair value of those shares could be paid. The only available remedy would be damages, equal to the fair value of the shares representing the overpayment by Single Point in the debt conversion. The only parties to whom that recovery could be paid are the plaintiffs. Hence, although under *Tooley* the claim could be brought derivatively or directly, as a practical matter, the only claim available after Cofiniti was liquidated is a direct action by the plaintiffs.

For these reasons, we conclude that the Court of Chancery committed reversible error in granting summary judgment dis-missing the plaintiffs' debt conversion claim.

## V. CONCLUSION

The judgment of the Court of Chancery granting summary judgment dismissing Count I of the Complaint (the debt conversion claim) is reversed, and the case is remanded for proceedings consistent with this Opinion.

plaintiffs did not plead any "special injury" to the minority shareholders distinct from any injury to the corporation or majority share-holder—a showing that under pre-*Tooley* case law was required to establish a direct claim.

Because the Court of Chancery's analysis of the debt reduction transaction focused solely upon its dilutive effect on the *shares,* rather than upon the quite separate injury to the *minority stockholders* (resulting from the in-crease in the majority stockholder's owner-ship interest at the minority's expense), that approach is inconsistent with the analysis we hold is required here. To the extent *Behrens* failed to take cognizance of the separate harm to the minority stockholders, it is overruled.

**29.** *Tooley,* 845 A.2d at 1039.

**30.** *Id.; Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993) ("the duty of loyalty mandates that the best interest of the corpora-tion and its shareholders takes precedence over any interest possessed by a ... control-ling shareholder and not shared by the stock-holders generally."); *Weinberger v. UOP,* 457 A.2d at 711 ("one may not mislead any stock-holder by use of corporate information to which the latter is not privy.").