EFiled: Jul 08 2015 02:10PM EDT
Transaction ID 57519087
Case No. 9809-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

July 8, 2015

A. Thompson Bayliss, Esquire
Sarah E. Hickie, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807

Johnna M. Darby, Esquire
Hiller & Arban, LLC
1500 North French Street, 2nd Floor
Wilmington, DE  19801

Re:   *Capella Holdings, Inc. v. Anderson*
      C.A. No. 9809-VCN
      Date Submitted:  March 12, 2015

Dear Counsel:

A company (and its operating subsidiary) and several of its fiduciaries have moved to dismiss counterclaims and third-party claims brought against them by a company founder who also is a former director and officer.  The claims relate to a 2014 recapitalization that led the founder to file a public complaint in Tennessee state court, and then to be terminated based on the disclosure of supposedly confidential information.  The founder has failed to plead that the recapitalization was unfair, but there are factual issues that prevent dismissal of his contract claims.  The Court thus grants the motion to dismiss in part and denies the motion in part.

*****

Counterclaim Defendants are Capella Holdings, Inc. ("Capella Holdings") and Capella Healthcare, Inc. ("Capella Healthcare," and collectively, "Capella"), as well as Capella directors Daniel S. Slipkovich ("Slipkovich"), Joseph P. Nolan ("Nolan"), David A. Donnini ("Donnini"), Joshua M. Earl ("Earl"), and Robert Z. Hensley ("Hensley," and collectively, the "Director Defendants"). They have moved to dismiss breach of fiduciary duty and contract claims made by Counterclaim Plaintiff James Thomas Anderson ("Anderson"), a founder and former director and officer of Capella.[1]

Capella is a Delaware corporation that operates "acute care hospitals and ancillary facilities."[2] Upon Capella's formation, affiliates of GTCR Golder

---

[1] Technically, the counterclaims were brought against Capella Holdings, and Capella Healthcare and the Director Defendants have been joined as Third-Party Defendants. Capella Holdings owns 100% of Capella Healthcare's stock, and the dispute involves a transaction in Capella Holdings's stock. For convenience, the Court does not distinguish between the Capella entities and uses the term "counterclaims" generally to refer to Anderson's claims.

[2] Verified Answer, Countercls. and Third-Party Compl. of Def. and Countercl./Third-Party Pl. James Thomas Anderson, Countercls. & Third-Party Compl. ("Countercl.") ¶ 15. Unless specified otherwise, the facts have been drawn from the Counterclaim.

Rauner II L.L.C. ("GTCR")[3] invested approximately $206 million for approximately 50 million common and 206,000 preferred shares of Capella. Capella's charter capped issuance of common stock at 75 million shares "to protect the minority shareholders from dilution."[4] Furthermore, under the terms of the Senior Management Agreement dated May 4, 2005, Capella was required to "reserve 2,211,688 additional shares of Common Stock . . . for issuance . . . to other executives and employees" of Capella and its subsidiaries.[5] Capella and Anderson were signatories to the Senior Management Agreement.

---

[3] The Court does not distinguish between GTCR and the funds or entities (excluding the Director Defendants) alleged to be affiliated with it. GTCR has not been named a party to this action.

[4] *Id.* ¶ 17. Anderson was promised that his share of common stock would not fall below 5%. He held 3,711,511 shares as of April 2014.

[5] Verified Compl. ("Compl.") Ex. C ("SMA") § 1(k). The full provision is as follows:

> (k) [Capella] shall reserve 2,211,688 additional shares of Common Stock (the "Additional Common Stock") for issuance (whether through restricted stock, upon exercise of options or otherwise) to other executives and employees of [Capella] and its Subsidiaries after the date hereof (including executives and employees of acquired companies); provided that in the event that any portion of such Additional Common Stock are not issued prior to the earliest to occur of (x) the redemption of all issued and outstanding Preferred Stock, (y) a Sale of the Company or (z) an initial Public Offering, the Board in its sole discretion may issue any or all of the remaining shares of

In 2013, GTCR began a sales process that resulted in a bid from Apollo Global Management, LLC ("Apollo") of $200 million for preferred securities convertible into at least 51% of Capella's common stock. According to Anderson, the bid thus valued the common at between $200 million and $400 million, or "at least $3.17 per share."[6] Counterclaim Defendants offer an October 30, 2013, bid letter from Apollo, which, however, makes clear that part of the investment was to be used to deleverage Capella.[7] Nevertheless, GTCR subsequently terminated the

---

> Additional Common Stock to the executives of [Capella] or its Subsidiaries (including [Anderson]) in the amounts determined by the Board. Any shares of Additional Common Stock not allocated by the Board to executives and employees of [Capella] and its Subsidiaries pursuant to the immediately preceding sentence shall remain unissued.

*Id.* (emphases omitted). The Senior Management Agreement is discussed in and is integral to the Counterclaim.

[6] Countercl. ¶¶ 26-27. Without belaboring the obvious, the Court notes that $200 million divided by 63 million shares equals approximately $3.17, which would not seem to account for preferred stock or other balance sheet items.

[7] Reply Br. in Supp. of Countercl. Defs.' Mot. to Dismiss ("Capella Reply Br.") Ex. B. Counterclaim Defendants assert that the Court can consider the letter because of Anderson's repeated references to the bid in the Counterclaim. Capella Reply Br. 15-16 & n.11. Anderson opposes consideration of the letter, contending during oral argument that his "allegations were not just based upon that document." Pl.'s Mot. to Dismiss Tr. ("Oral Arg. Tr.") 36-38.

The $200 million bid is the basis for Anderson's theory of damages. *See, e.g.*, Countercl. ¶¶ 23-27, 46; Def. and Countercl./Third-Party Pl. James Thomas Anderson's Answering Br. in Opp'n to Countercl. and Third-Party Defs.' Mot. to

process. GTCR then began changing management, including hiring new chief executive officer Mike Wiechart ("Wiechart"). Anderson was given, but did not execute, "'voluntary termination' papers" on December 20, 2013.[8]

The counterclaims relate to an April 17, 2014, recapitalization (the "Recapitalization"). Wiechart proposed the Recapitalization in February 2014, citing a need to avoid a potential debt rating downgrade and to "'incentivize'" employees.[9] Legal counsel was present and answered Anderson's questions at that February board meeting. As of then, Capella was able to issue approximately 12 million more shares of common stock, and Chief Financial Officer Denise Warren represented that "no downgrade was threatened or imminent."[10] She also "stated that no debt issuance was currently under consideration."[11]

---

Dismiss ("Anderson Answering Br.") 13. The Court acknowledges that the bid letter might present only part of the picture, but will nonetheless consider it. It would be unfair to Counterclaim Defendants to ignore this integral document completely, and Anderson should have known about its content and existence. *See In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at \*2-3 (Del. Ch. Feb. 21, 2014). Anderson, after all, was a director and officer at the time of the Apollo bid.
[8] Countercl. ¶ 29.
[9] *Id.* ¶ 37.
[10] *Id.* ¶ 38.
[11] *Id.*

The board members were provided with details of the Recapitalization less than 48 hours before their ultimate vote. In the Recapitalization, Capella would be authorized to issue over 1.2 billion shares of common stock. GTCR's preferred shares[12] would be converted into common shares based on a $0.175 per common share valuation, reportedly determined by "the amount of money that various investors had paid for their shares"—not fair market value.[13] Generally speaking, GTCR's ownership percentage would increase from 79.1% of Capella's common stock to 88%; Anderson's share would decrease from 6% to 0.308%; and the minority shareholders' share would decrease from 20% to less than 2%. GTCR also requested exclusive Delaware jurisdiction.

At an April 17, 2014, meeting, after receiving legal advice, Capella's board of directors approved the Recapitalization. Minutes from February presented at the April meeting noted "an imminent threat of a bond-ratings downgrade" and a lack of questions to legal counsel.[14] Anderson voted against the Recapitalization, while five directors—who were either GTCR "affiliates" or had "a direct pecuniary

---

[12] By April 2014, GTCR's preferred shares had accumulated in-kind interest of approximately 143,000 preferred shares.
[13] *Id.* ¶¶ 48-49.
[14] *Id.* ¶ 100-01.

interest through GTCR in maximizing the value of GTCR's investment"—voted in favor.[15] In Anderson's words, Donnini and Earl are "direct affiliates of GTCR";[16] Nolan is "a former direct affiliate in GRCR" who serves to benefit from "GTCR-affiliated investments";[17] Hensley is "a board member for multiple GTCR-affiliated companies";[18] and Slipkovich is a beneficiary of "employment agreements linked to the outcome of GTCR's investment in [Capella]."[19] GTCR had nominated Donnini, Earl, Nolan, and Hensley to the board.

Anderson filed an action in Tennessee state court on April 23, 2014, alleging breaches of contract and fiduciary duty and seeking rescission of the Recapitalization (the "Tennessee Complaint").[20] Included in the Tennessee Complaint was information about the Apollo bid, the Recapitalization, and alleged concerns about a debt-rating downgrade. Capella responded by purporting to terminate Anderson "for cause" under the Senior Management Agreement on

---

[15] *Id.* ¶ 60.

[16] *Id.* At oral argument, Anderson clarified that he uses "affiliate" as a term defined in the securities law context. Oral Arg. Tr. 50.

[17] Countercl. ¶ 60. Nolan had been an employee of GTCR before January 1, 2014.

[18] *Id.*

[19] *Id.* Slipkovich had served as chief executive officer before Wiechart.

[20] Compl. Ex. H. This document is not part of the Counterclaim, but its accuracy is not disputed and it is publicly available.

May 19, 2014, and filing this Delaware action.[21] Anderson's "breach of his duty of loyalty and breach of his confidentiality obligations" were cited as justifying the termination.[22] Capella has refused to pay Anderson severance.[23] In September 2014, Anderson "voluntarily dismissed his Tennessee case, without prejudice" and filed "mirror[ing]" claims through his Delaware counterclaims.[24]

---

[21] As relevant, cause means "a breach of [Anderson's] duty of loyalty to [Capella]" or "any material breach of [the Senior Management Agreement] . . . which is not cured within 15 days after written notice thereof." SMA § 9.

[22] Countercl. ¶ 126 (internal quotation marks omitted). Section 7(a) of the Senior Management Agreement restricts Anderson's ability to disclose confidential information, defined (in relevant part) as "any trade secrets or other information, observations and data obtained by [Anderson] during the course of his performance under this agreement . . . concerning the business or affairs" of Capella. SMA § 7(a). There is an exception for information "required to be disclosed pursuant to any applicable law or court order, provided that [Anderson] uses all reasonable efforts to obtain confidential treatment of such information." SMA § 7(a).

[23] Under the Senior Management Agreement, generally speaking, Anderson is entitled to his base salary for a one-year period beginning on the date of termination without cause—and absent violation of confidentiality and non-compete provisions. SMA § 6(e).

[24] Anderson Answering Br. 1.

\*\*\*\*\*

In this action, Anderson brings five counts, the first four focused on rescission of the Recapitalization[25] and the last focused on securing benefits under his employment agreement through an order for declaratory judgment and specific performance. In his first three counts, Anderson asserts duty of loyalty, duty of care, and duty of good faith claims against the Director Defendants and Capella Holdings for the directors' role in approving the Recapitalization.[26] Anderson alleges that the Recapitalization was conducted to benefit GTCR and management, without sufficient time and information, and for stated reasons that were false. He contends that entire fairness review is appropriate. Count IV accuses Capella of breaching the Senior Management Agreement "by authorizing the issuance of" more than the shares reserved for executives and employees (and more than the 75 million cap in its charter).[27] Anderson's final count faults Capella for failing to uphold severance pay and other obligations required for termination without

---

[25] More precisely, Anderson asks for "a permanent mandatory injunction voiding the recapitalization plan." Countercl. ¶¶ 76, 89, 106, 118.

[26] Count III is only brought against the Director Defendants.

[27] *Id*. ¶¶ 114-15.

cause.[28]  From these violations, Anderson claims to have suffered damages in an amount "unascertainable" at this stage.[29]

Counterclaim Defendants urge the Court to dismiss the counterclaims on the grounds of laches (or the impracticality of rescission), failure to comply with requirements for derivative claims, and failure to state a claim.  On the merits of the fiduciary duty claims,  Counterclaim Defendants argue that Anderson has not rebutted the presumption that the Director Defendants acted loyally, that the Section 102(b)(7) provision in Capella's charter[30] shields them from liability, and that Capella cannot breach a duty to itself.  They contend that the contract claims fail because "the clear and unambiguous language"[31] of the Senior Management Agreement supports their reading that the reserved share amount was a "floor,"[32] and Anderson has not identified an actual harm suffered.    Counterclaim

---

[28] He later suggests that his count for specific performance includes other benefits beyond severance pay, such as his title and position.  Anderson Answering Br. at 31.

[29] Countercl. ¶¶ 75, 88, 105, 117, 132.

[30] Compl. Ex. A, at A-6.  Anderson seems to contend that the rescission claims are not subject to the Section 102(b)(7) provision.  Anderson Answering Br. 27 n.7.

[31] Opening Br. in Supp. of Countercl. Defs.' Mot. to Dismiss ("Capella Opening Br.") 41-42.

[32] *Id.* at 43 (emphasis omitted).

Defendants add details of the Apollo bid in their reply to debunk Anderson's theory of damages. They also argue that "[t]he public existence of Anderson's Tennessee Complaint"[33] is enough to establish that Capella terminated him for good cause, which both triggered the repurchase of his shares and rendered him ineligible for severance payments. Finally, they observe a number of flaws in the request for specific performance of the Senior Management Agreement, including that the counterclaims substantively ask for money damages.

Anderson answers Counterclaim Defendants' contentions in turn, beginning with arguments that the pleadings do not support a laches defense and that he is bringing his claims directly, based on the dilution he suffered and the rescission he seeks.[34] With respect to his fiduciary duty claims, Anderson asserts that he states a claim because the Director Defendants needlessly approved a plan to increase ownership of controller GTCR at the expense of the minority shareholders. He claims that the Director Defendants were conflicted "thanks to their myriad ties to

---

[33] *Id.* at 45.

[34] He explains that even if rescission is not available, he is still entitled to other equitable remedies, such as rescissory damages. Anderson Answering Br. 11 n.1.

GTCR."[35]   He further cautions that resolving the contract claims on a motion to dismiss would require inappropriate factual determinations, "abstract" contract interpretation, and a balancing of the equities.[36]  For example, he observes that the facts surrounding his filing of the Tennessee Complaint have not been developed.

*****

On a motion to dismiss, the Court "accept[s] even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[37] Well-pleaded factual allegations are taken as true, reasonable inferences are drawn in favor of the complainant, and the Court grants the motion only if the complainant cannot prevail under any reasonably conceivable set of circumstances that can be proved.[38]  Although use of extrinsic evidence can convert a motion to dismiss into one for summary judgment,[39] the Court can consider, for limited purposes, documents that are "integral to a plaintiff's claim and incorporated in the

---

[35] *Id.* at 24.
[36] *Id.* at 27-28.
[37] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).
[38] *Id.*
[39] *See* Ct. Ch. R. 12(b).

complaint."[40]  Delaware Rule of Evidence Rule 201(b) further allows the Court to

take judicial notice of facts that are "'capable of accurate and ready determination

by resort to sources whose accuracy cannot reasonably be questioned.'"[41]

\*\*\*\*\*

Before the Court proceeds to the heart of its analysis, a brief explanation of

why it does not resolve part of this motion on Counterclaim Defendants' laches (or

impracticality) and derivative claim contentions is warranted.  First, Counterclaim

Defendants argue for dismissal because Anderson waited too long to ask for

rescission.  "Laches bars an action in equity if[] [t]he plaintiff waited an

unreasonable length of time before bringing the suit and . . . the delay unfairly

prejudices the defendant."[42]  Impracticality of undoing a transaction weighs against

rescission.[43]  While Counterclaim Defendants make compelling arguments, the

---

[40] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[41] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 n.28 (Del. 2006) (quoting D.R.E. 201(b)).

[42] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (second alteration and omission in original) (internal quotation marks omitted).

[43] *See Winston v. Mandor*, 710 A.2d 831, 833-35 (Del. Ch. 1996) (granting a motion to dismiss a rescission claim).

Court hesitates to decide the motion on these grounds when there is a factual dispute about what has happened since the Recapitalization closed.

Next, perhaps the first step of the analysis should be whether Anderson states direct or derivative fiduciary duty claims,[44] a point the parties vigorously debate. To maintain derivative claims, Anderson would need to comply with "Rule 23.1's pleading requirements . . . [and] the continuous ownership requirement."[45] For the purpose of judicial economy, however, the Court assumes that Anderson states direct claims. Anderson's fiduciary duty counterclaims do not expressly plead that he has suffered from exclusionary dilution of his voting rights by a controller as in *Gentile v. Rossette*,[46] but the Court will make the inference, for this decision, that Anderson brings those claims directly.[47]

---

[44] To the extent that Counterclaim Defendants argue that Anderson's contract claim for rescission is derivative, the Court accepts, for present purposes, that it is direct. Anderson asserts personal rights pursuant to his Senior Management Agreement with Capella.

[45] *See* Capella Opening Br. 3, 24-26 (citing cases).

[46] 906 A.2d 91 (Del. 2006).

[47] *See* Oral Arg. Tr. 35, 44-46.

*****

Moving to the merits of the claims, Anderson asserts breaches of the duties of care, good faith, and loyalty, as well as breaches of contract. As remedies, he asks for rescission, declaratory judgment, and specific performance. A breach of the duty of care rests on gross negligence.[48] A classic duty of loyalty claim involves self-interested conduct, and a good faith claim (also under the loyalty umbrella) arises "where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed."[49] As a general matter, directors are presumed to make business decisions "on an informed basis, in good faith and in the honest belief that the action taken [i]s in the best interests of the company."[50] Even when entire fairness scrutiny would otherwise seem to apply, a plaintiff must first "make

---

[48] *E.g.*, *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006).
[49] *Id.* at 66.
[50] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

factual allegations in its complaint that, if proved, would establish that the challenged transactions are not entirely fair" to state a claim.[51]

The critical dispute for Counts I through III (the fiduciary duty claims) is whether Anderson has made factual allegations that the Recapitalization was unfair to him. Anderson's claims of unfairness and of an entitlement to relief (through an entire fairness review, blending care, loyalty, and good faith issues) fundamentally are tied to the $3.17 per share stock price based on the Apollo proposal.

The facts in the Counterclaim are that, by summer 2013, GTCR held approximately 206,000 preferred shares from its initial investment and 143,000 preferred shares as accumulated in-kind interest.[52] Altogether, this interest was "redeemable" for approximately $349 million.[53] The Counterclaim also asserts that Capella's common stock was worth $3.17 per share. This allegation is speculative (and the proposal letter[54] does not fill in the unknowns). For example,

---

[51] *Monroe Cnty. Empls.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (observing a lack of factual allegations about unfair price and granting a motion to dismiss).

[52] Countercl. ¶¶ 18-19.

[53] *See id.* ¶ 19.

[54] Obviously, a bid letter is not a final proposal. The letter itself notes a need for further due diligence and discussions on the specific details of the arrangement.

Apollo was considering the investment of $200 million and anticipated that it would end up with a controlling equity position. That could support the $400 million upper range posited by Anderson for the common stock. Unfortunately, one cannot discern how much of Apollo's proposed investment would end up being converted into common stock or how much of what Apollo would pay to the Company would be kept as company funds (and not paid to pre-transaction equity holders)? Thus, the numbers which Anderson uses do not support the $3.17 per share price that is critical to his effort to demonstrate unfairness. Furthermore, since the Recapitalization gave GTCR approximately 9% more common shares, using Anderson's numbers would mean that GTCR traded its $349 million worth of preferred shares (and priority position) for at most an additional $35.6 million of common shares (or for the purpose of taking $22.6 million from Anderson).[55]

---

*E.g.*, Capella Reply Br. Ex. B, at 4. Whether a general and contingent proposal is a good starting point for a price analysis is a question the Court need not decide.

[55] *See* Anderson Answering Br. 13. Assuming (in the light most favorable to Anderson) that the Apollo bid valued Capella's common stock at $400 million, GTCR's 88% interest would be worth $352 million. A 79.1% interest would be worth $316.4 million.

At oral argument, Anderson explained that GTCR could increase its ownership to 98%. Oral Arg. Tr. 41. This would indicate a trade of $349 million in preferred stock for an additional $75.6 million in common stock.

The bid letter, if admissible at this stage, is evidence that $3.17 is not a reasonable valuation on which to rely—particularly for one who was an insider at the time the bid was made. Nonetheless, Anderson's valuation theory is tenuous even if the Court does not look at the letter. GTCR's initial ownership position is not in dispute. The Counterclaim also states that Apollo was making an offer for preferred securities, although convertible to a controlling interest in common stock. The Court cannot engage in speculation that Apollo saw some advantage to owning Capella common stock that somehow cancelled out Capella's preferred stock obligations (not to mention its debt).[56] Moreover, while there is an allegation that the $0.175 per share price was unfair itself, the factual basis given to infer unfairness is that $0.175 is "at least $3.00 per share less than the value of

---

Anderson estimates a personal loss of approximately $11.3 million, but a generous calculation using $400 million would roughly double that loss. To reach $11.3 million, he takes the difference in share price ($3.17-$0.175) and multiplies by the number of shares he holds.

[56] Counterclaim Defendants explain, "[I]t would be irrational for a company in Apollo's position to give a $200 million cash infusion to a company and then stand in line, if there were a liquidation, behind GTCR and the banks to the tune of at least $350 million." Oral Arg. Tr. 17.

the Apollo bid."[57]  Without well-pleaded allegations about the unfairness of the transaction, Anderson fails to plead his entire fairness case against the Director Defendants,[58] as well as against Capella.[59]

*****

Given the above analysis, Anderson's remaining claims are for breach of contract.  Count IV alleges breach of the Senior Management Agreement "by authorizing the issuance of greater than 2,211,688 shares of common stock for

---

[57] *See* Anderson Answering Br. 4, 22 (quoting Countercl. ¶¶ 45, 46); *see also* Oral Arg. Tr. 38-39 ("[O]ur expert is going to rip that [historical price] methodology apart . . . . [W]hat we've alleged . . . is that they used a price of 17 cents a share which . . . is at least $3 a share less than the actual value of the common shares . . . .").

Perhaps the $0.175 per share is tied to cost basis, a number that bears no necessary relationship to current value many years later, but it is not an allegation that the price was not reasonable in 2014.  A reasonable value and cost basis sometimes align.  In addition, Anderson may disagree with the decision to convert preferred shares to common, but, unless there is a valuation issue, the mere conversion from preferred to common does not form a basis for a claim.

[58] Anderson alleged in his Counterclaim that the Director Defendants had insufficient time to consider the Recapitalization plan but otherwise did not develop process (or duty of care) allegations in briefing or oral argument.

[59] *See* Anderson Answering Br. 19 n.4 ("The companies are included as defendants so that the rescission of the transaction can be imposed against the companies for the Director Defendants' unlawful conduct.").

issuance to other executives and employees"[60] and "greater than 75 million common shares."[61] Counterclaim Defendants argue that the Senior Management Agreement unambiguously set a minimum of shares to reserve "as a means to compensate . . . executives and management in a potential change-of-control context" but "by no means dictate[d] a *ceiling*" on future issuances.[62] The elements of a breach of contract claim are a contract, a breach of that contract, and resulting damages.[63] When interpreting a contract, the Court gives effect to the plain meaning of the language adopted by the parties.[64] "Dismissal is proper only if the defendants' interpretation is the only reasonable construction as a matter of law."[65]

---

[60] Countercl. ¶ 114.

[61] *Id*. ¶ 115.

[62] Capella Opening Br. 43.

[63] *E.g.*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013). The parties do not dispute that the Senior Management Agreement governs the contract claims.

[64] *E.g.*, *Palese v. Del. State Lottery Office*, 2006 WL 1875915, at *4 (Del. Ch. June 29, 2006) ("It is the duty of the court to construe agreements as they are made by the parties and to give to language that is clear, simple and unambiguous the force and effect which the language clearly demands." (internal quotation marks omitted)), *aff'd*, 913 A.2d 570 (Del. 2006) (TABLE).

[65] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

Section 1(k) of the Senior Management Agreement simply requires Capella to reserve approximately 2.2 million common shares for executives and employees; these shares can be issued to executives at the board's discretion if a triggering event occurs.[66] There is no language about a floor or a ceiling, and the parties do not direct the Court to other sections of the contract that show a clear intent to choose between the interpretations. Counterclaim Defendants' reading appears more promising, but Anderson's allegations about the 75 million share cap in Capella's charter and the promise to protect his ownership percentage indicate that his interpretation is at least reasonable at this stage. Anderson has failed to state a claim that the Recapitalization unfairly extracted monetary value from him. However, it is reasonably conceivable that Anderson suffered from a violation of his contract rights and rights associated with stock ownership, such as voting power.[67] Because the claim survives, limiting the possible remedies, if eventually necessary, should await further developments.

---

[66] *See supra* note 5.

[67] For reasons explained *infra*, the Court cannot yet conclude that Capella has properly repurchased Anderson's stock, following a termination for cause.

In his fifth count, Anderson alleges that Capella breached the Senior Management Agreement by terminating him without cause (and accruing additional violations for treating his termination as one for cause). Anderson argues that the Court must limit itself to the pleadings and that the motion to dismiss stage is inappropriate to resolve factual disputes. Defendants maintain that the critical facts are subject to judicial notice and indicate that Anderson was properly terminated for cause.

Again, the Court begins by looking to the language of the Senior Management Agreement. Confidential information includes information Anderson received as a director "concerning the business or affairs" of Capella.[68] Information about a recent bid, the Recapitalization, and credit-rating concerns qualify. The Senior Management Agreement has a limited exception for information "required to be disclosed pursuant to any applicable law,"[69] but Tennessee law did not dictate that Anderson's complaint be filed publicly.[70] The

---

[68] SMA § 7(a).

[69] SMA § 7(a).

[70] The rules in Tennessee simply require a court order or statutory authority to file a document under seal and require one seeking such an order to offer "sufficient facts to overcome the presumption in favor of disclosure." *See* Davidson Cnty.

Senior Management Agreement emphasizes the harm of breaching the confidentiality provision and takes away rights to severance pay for such a breach.[71] The difficulty with granting the motion to dismiss, however, is that termination for cause requires a breach of the duty of loyalty or a material breach of the Senior Management Agreement.[72] Those conclusions require factual determinations that cannot readily be made at this stage, in spite of the persuasive

---

Local Rs. Pract. § 7.02. Case law referenced in the rules elaborates that the party seeking the order must show good cause for protection—namely "that disclosure will result in a clearly defined injury to the party seeking closure." *Ballard v. Herzke*, 924 S.W.2d 652, 658 (Tenn. 1996). The analysis for good cause involves a balancing of a number of factors, including whether "the information . . . relates to a matter of public concern" and whether "the litigation involves private litigants." *Id.* at 658-59. This is, presumably, consistent with the Tennessee Constitution.

[71] *See* SMA § 6(e) ("[Anderson] shall be entitled to receive such severance payments only so long as [he] has not breached the provisions of Sections 7 or 8 hereof." (emphases omitted)); *id.* § 8(d) ("[Anderson] agrees and acknowledges that the restrictions contained in Section 7 and this Section 8 . . . are necessary to protect [Capella's] interest in [its] Confidential Information and other intellectual property . . . ." (emphases omitted)); *id.* ("[Anderson] agrees and acknowledges that the potential harm to [Capella] of the non-enforcement of Section 7 and this Section 8 outweighs any potential harm to [Anderson] of its enforcement by injunction or otherwise." (emphases omitted)).

[72] *See supra* notes 21-22. One can conceive of confidential information that, when disclosed to the public, would not result in material breach of an employment contract. Ascertaining materiality, with the burden on the Counterclaim Defendants, is a daunting task for a case in this procedural posture.

facts noted above. In short, however skeptical one may be about Anderson's future success on the merits, the limitations of Rule 12(b)(6) preclude dismissal of his final count.[73]

*****

For the reasons above, Counterclaim Defendants' motion to dismiss is granted with respect to the fiduciary duty claims and denied with respect to the breach of contract claims.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:  Register in Chancery-K

---

[73] Again, remedies can be addressed at a later time. For the time being, the Court observes that specific performance is not awarded if damages provide an adequate remedy, *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *4 (Del. Ch. June 6, 2006), *aff'd* 913 A.2d 571 (Del. 2006) (TABLE), and restoring Anderson's "position" and other aspects of employment seems inappropriate now that "disputes have arisen and confidence and loyalty are gone." *See Brown v. Bd. of Educ. of New Castle Cnty. Vocational Technical Sch. Dist.*, 1989 WL 72786, at *3 (Del. Ch. June 27, 1989).