# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARTIN J. SIEGEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2024-0146-LWW |
| | : | |
| CANTOR FITZGERALD, L.P. and HOWARD LUTNICK, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: January 9, 2025
Date Decided: April 10, 2025

Kimberly A. Evans, Lindsay K. Faccenda, Irene R. Lax, Robert Erikson, BLOCK & LEVITON LLP, Wilmington, Delaware; Jason Leviton, Nathan Abelman, BLOCK & LEVITON LLP, Boston, Massachusetts; Jeremy Friedman, David Tejtel, Lindsay La Marca, David Rosenfeld, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Counsel for Plaintiff Martin J. Siegel*

C. Barr Flinn, Paul J. Loughman, Skyler A. C. Speed, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Patrick Gibbs, Shannon Eagan, COOLEY LLP, Palo Alto, California; Sarah Lightdale, Bingxin Wu, COOLEY LLP, New York, New York; *Counsel for Defendants Cantor Fitzgerald, L.P. and Howard Lutnick*

**Will, Vice Chancellor**

In 2023, BGC Partners, Inc. converted from an umbrella partnership corporation to a full C corporation. BGC's majority stockholder, Cantor Fitzgerald, L.P., had a contractual consent right over the reorganization. Cantor agreed to exchange its limited partnership units and associated benefits for shares of high-vote BGC common stock, which increased its voting power. Although BGC's minority stockholders owned the same number of shares before and after the corporate conversion, their collective voting power was diluted.

The plaintiff asserts that the greater voting control Cantor secured through the reorganization was an unfair, non-ratable benefit that damaged BGC's minority stockholders. He styles his breach of fiduciary duty claim as a direct one, brought on behalf of a putative class whose voting power was diminished. But his claim is fundamentally derivative under settled Delaware law.

The crux of the plaintiff's complaint is that BGC overissued shares of high-vote common stock to Cantor for inadequate consideration. This is an alleged harm to BGC, which would receive the benefit of any recovery from Cantor. The minority stockholders' reduced voting power is an indirect, pro rata harm.

Because the plaintiff neither made a demand nor pleaded demand futility, his complaint is dismissed under Rule 23.1.

1

## I. FACTUAL BACKGROUND

The following facts are drawn from the Verified Class Action Complaint (the "Complaint"), the documents it incorporates by reference, and matters subject to judicial notice.[1]

### A. BGC's Reorganization

In 2023, BGC Partners, Inc. ("Old BGC") completed a corporate reorganization (the "Reorganization") that made it a wholly owned subsidiary of BGC Group, Inc. ("New BGC"), a newly formed holding company.[2]

BGC's business remained the same throughout the Reorganization.[3] BGC was—and is—a leading global financial brokerage and technology company.[4]

---

[1] Verified Class Action Compl. (Dkt. 1) ("Compl."); *see DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 351 n.7 (Del. 2017) (taking judicial notice of public filings with the SEC); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("Because the contested proxy statements were expressly referred to and heavily relied upon in the Complaint, they are considered to be incorporated by reference into the Complaint.").

Exhibits to the Transmittal Affidavit of Skyler A. C. Speed in Support of the Opening Brief in Support of Defendants' Motion to Dismiss the Verified Class Action Complaint are cited as "Defs.' Ex. __." Dkt. 15. Certain exhibits were produced in response to the plaintiff's Section 220 demand and are deemed incorporated by reference into the Complaint by agreement of the parties. Defs.' Ex. 2 (Confidentiality Agreement) § 7(h); *see Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016). Pincites to exhibits refer to the pagination added by the defendants.

[2] Compl. ¶ 1.

[3] Because the business remained the same, this opinion refers to the enterprise as "BGC," unless there is reason to specify the pre- or post-Reorganization entity (*i.e.*, Old BGC or New BGC).

[4] Defs.' Ex. 1 (Sched. 14A, filed on May 26, 2023 ("Proxy")) 17.

Cantor Fitzgerald, L.P. continues to hold a majority of BGC's voting power—as it did pre-Reorganization. The same Board of Directors and executive officers oversaw BGC's business both before and after the Reorganization.[5]

The Reorganization changed BGC's corporate structure. Beforehand, BGC was an umbrella partnership corporation (or Up-C). Afterward, BGC became a full C corporation.

### B. Old BGC's Up-C Structure

An Up-C structure, in its most basic form, consists of a parent holding corporation and a non-public operating subsidiary (typically a limited liability company or limited partnership). For tax purposes, the operating business is a pass-through entity, meaning that its profits and losses are passed directly to its owners without being taxed at the entity level.[6]

Publicly-traded Old BGC sat atop a pass-through limited partnership, BGC Holdings, L.P.[7] Old BGC and BGC Holdings together owned 100% of two non-public operating partnerships: (1) BGC Partners, L.P., which holds BGC's U.S.

---

[5] Proxy 27; *see, e.g.*, Compl. ¶¶ 11-13. Two directors left the Board in December 2022, after the Reorganization was approved but before it closed. Defs.' Ex. 3 (Sched. 14A, filed on Sept. 28, 2023) 13.

[6] *See generally* Joshua Ford Bonnie & William R. Golden, *Up-C Initial Public Offering Structures: Overview*, Practical Law, https://www.stblaw.com/docs/default-source/related-link-pdfs/up-c-initial-public-offering-structures-overview.pdf (last visited Apr. 8, 2025).

[7] Compl. ¶ 21; *see* Proxy 10.

business, and (2) BGC Global Holdings, L.P., which holds BGC's non-U.S. business.[8]

The limited partners of BGC Holdings were Cantor and certain BGC founders and employees. These limited partners participated in the economics of the operating companies through their ownership of limited partnership (LP) units in BGC Holdings.[9] Old BGC's stockholders, by contrast, participated in the economics of the operating companies indirectly through their shares of Old BGC.[10]

Old BGC's structure took roughly the following form:[11]



---

[8] Compl. ¶ 21; *see* Defs.' Ex. 3 at 115; Defs.' Ex. 4 (Form 8-K, filed Apr. 7, 2008) 7. As part of the 2008 transaction that created the Up-C structure, Cantor, Old BGC, and other parties executed a Separation Agreement that gave Cantor a one-time right to cause Old BGC to become a wholly owned subsidiary of a new holding company. Defs.' Ex. 4 at Ex. 2.4 ("Separation Agreement") § 4.09.

[9] Compl. ¶ 23; *see* Proxy 2.

[10] Proxy 2.

[11] Dkt. 34 (Defs.' Jan. 9, 2025 Hr'g Presentation) 7.

### 1. Old BGC's Common Stock

Old BGC had two classes of common stock. Class A common shares were held by public stockholders and had one vote per share.[12] Class B common shares were held exclusively by Cantor and had ten votes per share.[13] Cantor could convert the Class B shares into Class A shares on a one-for-one basis at any time.[14] The classes were otherwise identical.[15]

Because of its ownership of high-vote Class B shares, Cantor held 57% of BGC's total voting power.[16] Howard Lutnick was the Chairman and CEO of BGC during the events at issue in this action.[17] He recently stepped down from those roles when he was confirmed as the United States Secretary of Commerce.[18] At the time of the Reorganization, Lutnick held a controlling interest in Cantor's managing general partner, CF Group Management, Inc., which gave him effective control over Cantor and BGC both before and after the Reorganization.[19]

---

[12] Compl. ¶ 22.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 18.

[17] Proxy 103; Defs.' Ex. 3 at 10.

[18] *See Howard Lutnick Confirmed as 41st United States Secretary of Commerce; Steps down from his positions at Cantor Fitzgerald, L.P.*, Cantor (Feb. 18, 2025), https://www.cantor.com/howard-lutnick-confirmed-as-41st-united-states-secretary-of-commerce-steps-down-from-his-positions-at-cantor-fitzgerald-l-p/.

[19] Compl. ¶ 7; *see* Defs.' Ex. 3 at 135.

### 2. BGC Holdings' LP Units

Cantor also owned 58.2 million LP units of BGC Holdings, which were exchangeable for shares of Old BGC common stock.[20]  Cantor had the right, under BGC Holdings' Second Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement"), to exchange its LP units for shares of Old BGC common stock.[21]  Cantor's LP units were "exchangeable for shares of BGC Partners Class B Common Stock" in the first instance.[22]  If there were not enough Class B shares authorized and unissued for a full exchange, Cantor would receive Class A shares for the balance of its LP units.[23]

By the time the Reorganization was being negotiated, BGC's Audit Committee had already approved the issuance of 23.6 million additional shares of Class B common stock.[24]  If Cantor had exercised its one-time exchange right, it would have been entitled to 23.6 million shares of Class B common stock and 34.6 million shares of Class A common stock.[25]  That exchange would have increased

---

[20] Proxy 31.

[21] *See* Defs.' Ex. 5 (Form 8-K, filed Dec. 19, 2017) Ex. 10.1 ("Partnership Agreement").

[22] *Id.* § 1.01 (defining Cantor's LP units as defined as "Exchangeable Limited Partnership Interests"); *see also* Proxy 30-31.

[23] Partnership Agreement § 8.10(d).

[24] *See* Proxy 56.

[25] *Id.* at 35.

6

Cantor's voting power to 68.4%.[26] Any further issuances of Class B common stock beyond the 23.6 million shares previously authorized required the Audit Committee's approval.[27]

### C. The Reorganization Proposal

In June 2019, Lutnick told Old BGC's Board that BGC management was contemplating "a potential change by BGC to a pure corporate structure from the existing partnership structure."[28]

Because of standing contractual arrangements, BGC could not undertake this sort of transaction without Cantor's consent.[29] Changing from an Up-C to a C corporation would, however, eliminate certain benefits to Cantor from its indirect ownership of BGC's operating entities.[30]

Several months later, in November, BGC's Audit Committee formed a special committee to negotiate with Cantor about the proposed corporate conversion.[31] The special committee consisted of the same four outside directors who made up the

---

[26] *Id.*

[27] *Id.* at 56.

[28] Compl. ¶ 25.

[29] Proxy 55-56; *see* Separation Agreement § 4.09; *see also* Compl. ¶ 84.

[30] *See* Proxy 59 (listing potential "several adverse consequences to Cantor" from a corporate conversion transaction).

[31] Compl. ¶ 28.

Audit Committee: David Richards, Linda Bell, William Moran, and Stephen Curwood.[32]

Discussions were postponed due to the COVID-19 pandemic.[33] They resumed in April 2021 when Cantor sent a draft term sheet to BGC's Board.[34] The term sheet contemplated that BGC would use a pair of mergers to replace Old BGC's Up-C structure with a single Delaware corporation.[35] It proposed that "public [Old BGC] stockholders w[ould] hold an equal or greater percentage of the fully diluted share count of [New BGC] as of immediately after the [m]ergers as compared to what they held as of immediately prior to the [m]ergers."[36]

The term sheet was provided to both the Audit and Compensation Committees of BGC's Board.[37] By end of June 2021, the Board had formed a "Joint Committee" of the same four directors who made up the original special committee.[38] The Joint

---

[32] *Id.* ¶¶ 2 n.2, 28. The plaintiff alleges that these four directors were beholden to Lutnick. *Id.* ¶¶ 9-10. This court rejected similar allegations about Bell, Moran, and Curwood in a separate case involving a different BGC transaction. *See In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *17, *21 (Del. Ch. Aug. 19, 2022), *aff'd*, 303 A.3d 337 (Del. 2023); *see also In re BGC P'rs Inc. Deriv. Litig.*, 2021 WL 4271788, at *6 (Del. Ch. Sept. 20, 2021).

[33] Compl. ¶¶ 39-40.

[34] *Id.* ¶ 43.

[35] *Id.*

[36] *Id.*

[37] *Id.* ¶ 44.

[38] *Id.* ¶¶ 52-53; *see* Proxy 56-57.

8

Committee met five times between April 30 and June 16, 2021, before its purpose and mandate were formally defined by the Board on June 28.[39]

The Joint Committee engaged Debevoise & Plimpton LLP as its counsel and Houlihan Lokey, Inc. as its financial advisor.[40] Debevoise had worked with Old BGC on multiple prior transactions; Houlihan was selected on the recommendation of Debevoise.[41] The Joint Committee also consulted the Compensation Committee's outside consultants.[42]

### D. Negotiations Over Cantor's LP Unit Exchange

The Joint Committee began negotiations with Cantor in August 2021.[43] The main sticking point was Cantor's insistence that it be able to exchange all of its BGC Holdings LP units for shares of BGC Class B common stock, rather than for a mix of Class A and B shares. Cantor believed that BGC should authorize the issuance of sufficient Class B shares—above the 23.6 million previously authorized by the Audit Committee—for this purpose.[44]

---

[39] Compl. ¶¶ 46-53.

[40] *Id.* ¶¶ 29, 37, 46, 50.

[41] *Id.* ¶ 17.

[42] *Id.* ¶ 54.

[43] *Id.* ¶¶ 60-61.

[44] *See* Proxy 59.

Houlihan advised the Joint Committee that if all of Cantor's LP units were exchanged for Class B shares, Cantor would have approximately 70% of the post-Reorganization company's voting power.[45] But if the Joint Committee refused Cantor's demand and only the previously-authorized 23.6 million Class B shares were available, Cantor would have approximately 68% of the post-Reorganization company's voting power.[46] The difference would give Cantor a cushion to maintain its control if additional shares of common stock were issued in the future.[47]

During the fall of 2021, the Joint Committee sought concessions from Cantor in exchange for the increased voting power Cantor desired.[48] Cantor rejected nearly all proposals.[49] It insisted that it would not allow the Reorganization to proceed unless it could convert its LP units entirely into shares of Class B stock.[50]

With Cantor unwilling to relent on its demand, the Joint Committee turned its focus to different structures and terms for the conversion. In June 2022, it sent Cantor a counterproposal contemplating that (1) 23.6 million of Cantor's LP units would convert into Class B shares, and (2) Cantor's remaining LP units would

---

[45] Compl. ¶ 64.

[46] *Id.*; *see supra* notes 24-27 and accompanying text.

[47] Compl. ¶¶ 65, 67.

[48] *Id.* ¶¶ 66-75.

[49] *Id.* ¶¶ 93-95.

[50] *Id.*

10

convert into Class A shares, but could later convert into Class B shares if BGC issued "a material amount of new equity" to fund an acquisition within a set time after the Reorganization.[51] Cantor said that a threshold of 10 million shares of new equity was "generally acceptable" for this purpose, but the Joint Committee felt that it was too low.[52] In September, the Joint Committee sent Cantor a revised term sheet with a threshold of "the greater of (1) $100 million of shares of new equity and (2) 25 million shares of new equity."[53] Cantor responded with a $75 million threshold; the Joint Committee "folded."[54]

### E. Reorganization Approval and Implementation

On November 14, 2022, the Joint Committee recommended that the Board approve the Reorganization.[55] The Board, including Lutnick, did so the next day.[56]

On May 26, 2023, BGC issued a proxy statement that gave an overview of the Reorganization's negotiating history.[57] It also explained public stockholders' rights before and after the Reorganization.[58]

---

[51] Compl. ¶ 86 (quoting proposal).

[52] *Id.* ¶ 85; *see id.* ¶¶ 87-88.

[53] *Id.* ¶ 88; Proxy 54.

[54] Compl. ¶ 90.

[55] *Id.* ¶ 102.

[56] *Id.* ¶ 8.

[57] Proxy 54-56.

[58] *Id.* at 123-26.

A majority of BGC's public stockholders voted in favor of the Reorganization.[59] The Reorganization was not conditioned on a majority-of-the-minority vote.[60]

The Reorganization closed on July 1, 2023.[61] It was effectuated through three separate merger transactions. First, BGC Holdings merged with its subsidiary, BGC Holdings Merger Sub, LLC, with the merger sub surviving as a subsidiary of Old BGC.[62] Second, BGC Partners II, Inc.—a wholly owned subsidiary of New BGC—merged with Old BGC, with Old BGC surviving as a direct subsidiary of New BGC.[63] Third, BGC Partners II, LLC—a wholly owned subsidiary of New BGC—merged with BGC Holdings Merger Sub, LLC.[64] In the end, Old BGC and BGC Holdings became wholly owned subsidiaries of New BGC.

---

[59] *See* Defs.' Ex. 11 (Form 8-K, filed July 3, 2023) 7.

[60] *See* Compl. ¶¶ 49, 71 & n.4.

[61] Defs.' Ex. 11 at 2.

[62] Defs.' Ex. 3 at 90-91.

[63] *Id.*

[64] *Id.*

New BGC's structure took roughly the following form:[65]



Two exchange transactions were intrinsic to this Reorganization. One transaction involved the exchange of shares of Old BGC common stock for shares of New BGC common stock. Shares of Old BGC Class A common stock converted into New BGC Class A common stock on a one-for-one basis.[66] Cantor's 45.9 million shares of Old BGC Class B common stock converted into 45.9 million shares of New BGC Class B common stock.[67] Another transaction involved the exchange of Cantor's 58.2 million LP units in BGC Holdings for 58.2 million shares of New BGC Class B common stock.[68] Cantor also exercised purchase rights granted by

[65] Dkt. 34 (Defs.' Jan. 9, 2025 Hr'g Presentation) 8.

[66] Proxy 56.

[67] *Id.* at 56, 80.

[68] *Id.*

BGC Holdings' Partnership Agreement to acquire another 5.7 million exchangeable LP units that converted into Class B shares.[69]  In total, Cantor held approximately 110 million shares of New BGC Class B common stock after the Reorganization.[70]

As a result of these transactions, Cantor's total voting power over BGC increased from 57.7% to 75.6%.[71]  This increase was about 7.2% higher than Cantor's voting power would have been "if Cantor had exchanged its exchangeable limited partnership interests in BGC Holdings for [BGC] common stock absent the corporate conversion."[72]  Although BGC's minority stockholders continued to hold the same number of shares before and after the Reorganization, their collective voting power decreased from 42.3% to 24.4%.[73]

## F.    This Litigation

On February 16, 2024, Martin J. Siegel brought this putative class action on behalf of himself and Class A stockholders of Old BGC whose shares were

---

[69] *Id.*

[70] *Id.* at 80.

[71] *Id.* at 35.  The plaintiff alleges that the Reorganization increased Cantor's voting power to 68.4%.  Based on BGC's proxy statement and other documents incorporated by reference into the Complaint, this figure appears to be an error.  *See* Compl. ¶ 4 (alleging that Cantor's voting power increased to 68.4% after the Reorganization, "further cementing Cantor's control over the Company"); *see also id.* ¶¶ 103, 111.

[72] Proxy 55.

[73] *Id.* at 3 ("[Holders of BGC Partners Class A common stock will receive an equal number of shares of BGC Group Class A common stock . . . ."); *see id.* at 35.

14

exchanged for Class A shares of New BGC in the Reorganization.[74] His suit follows a production of books and records from BGC under 8 *Del. C.* § 220. He alleges a single breach of fiduciary duty against Cantor and Lutnick.[75]

The defendants moved to dismiss the Complaint on April 22, 2024.[76] Briefing on the motion was complete by August 16.[77] After oral argument on January 9, 2025, the motion was taken under advisement.[78]

## II.    ANALYSIS

The plaintiff alleges that Cantor (as BGC's controlling stockholder) and Lutnick (as its "ultimate controller") breached their fiduciary duties by undertaking a Reorganization that benefitted Cantor and harmed public stockholders.[79] The defendants have moved to dismiss this claim under Court of Chancery Rule 23.1.[80] They argue that the claim is derivative and that the plaintiff neglected to plead demand futility. In response, the plaintiff insists that his claim is direct.

---

[74] Compl. 1; *id.* ¶¶ 124-26.

[75] *Id.* ¶¶ 123-25.

[76] Opening Br. in Supp. of Defs.' Mot. to Dismiss the Verified Class Action Compl. (Dkt. 15) ("Defs.' Opening Br.").

[77] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 21) ("Pl.'s Answering Br.") Defs.' Reply Br. in Support of Their Mot. to Dismiss the Verified Class Action Compl. (Dkt. 31) ("Defs.' Reply Br.").

[78] *See* Dkt. 33.

[79] Compl. ¶ 1.

[80] The defendants' motion is also brought under Rule 12(b)(6). *See* Dkt. 15 (Mot.). Their opening brief focuses on their Rule 23.1 arguments. *See* Defs.' Opening Br. 34.

I begin by applying the *Tooley* test and conclude that the plaintiff's claim is derivative. I go on to consider each of the plaintiff's arguments for treating his claim as direct. None succeed. Because the plaintiff neither made a demand nor pleaded demand futility, the Complaint is dismissed under Rule 23.1.

## A. The *Tooley* Test

The plaintiff alleges that Cantor and Lutnick breached their fiduciary duties by "agreeing to and entering into the Reorganization without ensuring that the Reorganization was entirely fair to [the plaintiff] and other public stockholders."[81] Although the plaintiff styles his claim as a direct one, this court must "look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged."[82] To do so, the court applies the test set out in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[83] Under *Tooley*, the determination of whether a claim is direct or derivative turns "solely on the following questions: (1) who suffered the alleged harm (the corporation or suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[84]

---

[81] Compl. ¶ 125.

[82] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018).

[83] 845 A.2d 1031 (Del. 2004).

[84] *Id.* at 1033.

The answers to both questions indicate that the plaintiff's claim is derivative. The harm complained of is an overpayment to Cantor by BGC in the form of Class B shares. The benefit of any recovery would flow to BGC, with its minority stockholders benefitting indirectly and pro rata.

### 1. Who suffered the alleged harm?

The plaintiff claims that the Reorganization was unfair to BGC's minority stockholders because it "increased Cantor's voting power" without Cantor paying "adequate consideration."[85] The Complaint states that "the Reorganization allowed Cantor, and therefore Lutnick, to materially increase their control over the Company. By sharp contrast, any benefits bestowed upon Old BGC were, at best, nebulous."[86] This is a classic overpayment claim, which is "exclusively derivative."[87]

In *Brookfield Asset Management, Inc. v. Rosson*, the Delaware Supreme Court reached the same conclusion regarding a similar claim.[88] There, minority stockholder plaintiffs alleged that the corporation issued shares to its controlling

---

[85] Compl. ¶ 103.

[86] *Id.* ¶ 1; *see also id.* ¶¶ 91, 92, 94, 109 (faulting the Joint Committee for "acquiesc[ing]" to Cantor in negotiating the Reorganization, including by not securing Cantor's agreement to bear more of the "expenses incurred by Old BGC/New BGC" or to "indemnify Old BGC/New BGC for any and all material income taxes"); *id.* ¶ 113 (alleging that Houlihan did not "perform a true 'give-get' analysis").

[87] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1266-67 (Del. 2021).

[88] *Id.* at 1259.

stockholder for an unfairly low price.[89]  The plaintiffs argued that the transaction increased the controlling stockholder's voting power, resulting in the dilution of minority stockholder's financial and voting interests.[90]

With respect to *Tooley*'s first prong, the court reasoned that the corporation suffered the alleged "harm" of "overpayment (or over-issuance) of shares to the controlling stockholder" because "the value of the entire corporate entity, of which each share of equity represents an equal fraction," was diminished.[91]  It explained that "when a corporation exchanges equity for assets of a stockholder who is already a controlling stockholder for allegedly inadequate consideration, the dilution/overpayment claim is exclusively derivative."[92]

Applying the *Tooley* test in this case leads to the same result.  The plaintiff's claim, at bottom, is that BGC overissued high-vote Class B shares to Cantor—its controlling stockholder.[93]  The resulting injury was to BGC, which "has a claim to

---

[89] *Id.* at 1257-59.  The plaintiffs also asserted an entrenchment claim, alleging that the stock sale allowed Brookfield to expand its majority voting control from 51% to 65.3%, such that a subsequent stock issuance by the company would not eliminate Brookfield's majority stockholder status.  *Id.* at 1280.

[90] *Id.* at 1260.

[91] *Id.* at 1280.

[92] *Id.* at 1266.

[93] Compl. ¶ 103 ("[T]he Reorganization increased Cantor's voting power . . . [and] public stockholders did not receive adequate consideration for conferring this significant benefit on Cantor.").

compel the restoration of value of the overpayment" to Cantor.[94]  Any harm to the minority stockholders "flowed indirectly to them in proportion to, and via, their shares in" BGC.[95]

The plaintiff cannot demonstrate an injury to the minority stockholders "that is not dependent on [this] prior injury to the corporation."[96]  He asserts that minority stockholders "receiv[ed] an unfairly low price for their shares."[97]  But his claim implicates a threshold harm to BGC: that BGC received inadequate consideration from Cantor (primarily Cantor's BGC Holdings LP units) in exchange for the issuance of additional shares of BGC Class B common stock.[98]

Cantor received the Class B shares (and resulting increase in voting power) from BGC—not public stockholders.  If Cantor had paid "fair value" in exchange,

---

[94] *Brookfield*, 261 A.3d at 1266.

[95] *Id.* ("The economic and voting power dilution that allegedly harmed the stockholders flowed indirectly to them in proportion to, and via, their shares in [the corporation], and thus any remedy should flow to them in the same way, derivatively via the corporation.").

[96] *Agostino v. Hicks*, 2004 WL 44398, at *7 (Del. Ch. Mar. 11, 2004) ("Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?").

[97] Pl.'s Answering Br. 20.

[98] *See* Compl. ¶ 1.

the payment would have been made to BGC—not public stockholders. Thus, the harm identified is a derivative one.[99]

### 2. Who would receive the benefit of any recovery?

Because BGC suffered the primary harm for its alleged overissuance of Class B shares to Cantor, it "logically follow[s]" that BGC would receive the benefit of any recovery.[100] BGC, then, is the party with "a claim to compel the restoration of the value of the overpayment."[101] BGC could, for example, demand additional payment from Cantor.[102] In fact, the Complaint expressly seeks "monetary,

---

[99] *See Erisman v. Zaitsev*, 2021 WL 6134034, at *15 & n.152 (Del. Ch. Dec. 29, 2021) (holding that dilution claims concerning an LLC's issuance of new units to a target as merger consideration were "exclusively derivative" (citing *Brookfield*, 261 A.3d at 1278)); *New Enter. Assoc. 14 v. Rich*, 292 A.3d 112, 156 (Del. Ch. 2023) ("[T]he Delaware Supreme Court h[eld] definitively [in *Brookfield*] that claims for equity dilution are only and always derivative.").

[100] *Tooley*, 845 A.2d at 1036.

[101] *Brookfield*, 261 A.3d at 1266.

[102] *See id.* at 1266 n.64 (observing that a potential remedy "could be cancelling the shares and allowing the corporation to sell them for fair value or requiring the acquirer to pay fair value for the shares"). One of the possible remedies identified by the plaintiff involves converting some of Cantor's Class B shares into Class A shares. If that were to occur, the remedy would still not flow directly to BGC's minority stockholders.

recessionary, and/or nominal damages to the Class *and/or New BGC*."[103]   The

minority stockholders would benefit from that recovery pro rata.[104]

      The plaintiff insists that any recovery could not be shared "pro rata among all

stockholders" because one significant stockholder—Cantor—was unharmed.[105]   But

the same was true of the controlling stockholder in *Brookfield*, whose voting power

increased from 51.0% to 65.3% in the challenged transaction.[106]   The Delaware

Supreme Court explained that only the corporation could compel the restoration of

value for the overissuance, and the minority stockholders would be "beneficiaries of

that recovery on [a] *pro rata* basis."[107]   So too here.

## B.    The Plaintiff's Arguments

      The plaintiff maintains that his claim is direct for several reasons.  He asserts

that his claim (1) concerns a direct impairment of stockholder rights, (2) falls within

---

[103] Compl. 46 (emphasis added); *cf. Brookfield*, 261 A.3d at 1266 (noting that the minority stockholder plaintiffs sought recovery on behalf of the company).  The plaintiff asserts that this admission was "inadvertent" and states that he "will amend his Complaint to remove the language if the Court desires."  Pl.'s Answering Br. 19 n.57.  But he has opted not to amend his pleading.  Even if he had, removing this text would not turn a derivative claim into a direct one.

[104] *See Brookfield*, 261 A.3d at 1277 ("If the corporation recovers the overpaid funds, then the minority shareholders are beneficiaries of that recovery on that same pro rata basis.").

[105] Pl.'s Answering Br. 20.

[106] *Brookfield*, 261 A.3d at 1259.

[107] *Id.* at 1277 ("In a corporate-overpayment-to-a-controlling shareholder claim, the amount of the overpayment deprives the corporation of assets to which minority shareholders only have a pro rata claim as residual claimants on the corporation's assets.

an exception to the general rule for overpayment claims, and (3) is distinguishable from *Brookfield*. None of these arguments change the reality that his claim is derivative under *Tooley*.

### 1. Alleged Franchise Impairment

First, the plaintiff argues that "claims challenging interference with and/or reduction of the stockholder voting franchise involve fundamentally direct harm."[108] This theory finds no support in our law.[109] Stockholders lack a "fundamental" right to any fixed percentage of the voting power.[110] And "[d]ilution is not *per se*

---

If the corporation recovers the overpaid funds, then the minority shareholders are beneficiaries of that recovery on the same pro rata basis.").

[108] Pl.'s Answering Br. 18.

[109] The cases relied on by the plaintiff concern either personal rights held by stockholders (i.e., redemption rights in the context of special purpose acquisition companies) or challenges to stockholder rights plans. *Id.* Neither situation is apt. In the first type of matter, the alleged harm could not have "run to the corporation" because the corporation lacked a redemption right and public stockholders' funds "did not belong to [the corporation] until those stockholders opted not to redeem." *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 802 (Del. Ch. 2022); *see also Laidlaw v. GigAcquisitions2, LLC*, 2023 WL 2292488, at *6 (Del. Ch. Mar. 1, 2023). In the other type, the court held that the plaintiffs stated direct claims where poison pills "infringed on stockholders' fundamental rights to sell and vote." *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *19-20 (Del. Ch. Feb. 26, 2021); *see In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 79 (Del. Ch. 1999) (recognizing that impairment of stockholders' "voting power or freedom" or "right to receive sales offers" gives rise to direct claims). But the plaintiff here does not allege that the Reorganization imposed any restrictions on the minority stockholders' ability to vote or sell their shares.

[110] *See Williams*, 2021 WL 754593, at *20 ("Modern corporate law recognizes that stockholders have three fundamental, substantive rights: to vote, to sell, and to sue." (citation omitted)).

wrongful."[111]  Were it otherwise, existing stockholders would have a cognizable direct claim whenever a corporation issues new equity.

The plaintiff's argument harkens back to the now-disregarded concepts of "special injury" and "dual-natured claims."[112]  Our law in this area has followed a winding path.  Walking the steps that led to its current state reveals the flaws in the plaintiff's position.

The "special injury" concept emerged in *Elster v. American Airlines*—a Court of Chancery decision from 1953.[113]  *Elster* held that "where the alleged injury is to both the corporation *and* to the stockholder, the stockholder must allege a 'special injury' to maintain a direct action."[114]  Forty years later, in *In re Tri-Star Pictures, Inc. Litigation*, the Delaware Supreme Court explained that "[a] special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote."[115]  There, minority stockholders' dilution

---

[111] *Hindlin v. Gottwald*, 2020 WL 4206570, at *4 (Del. Ch. July 22, 2020) ("As a matter of basic arithmetic, shareholders are diluted every time a company issues new equity.").

[112] *See* Pls.' Answering Br. 19-20.

[113] 100 A.2d 219, 222 (Del. Ch. 1953).

[114] *Tooley*, 845 A.2d at 1037.

[115] 634 A.2d 319, 330 (Del. 1993).

23

claims were allowed to proceed as direct because the plaintiffs alleged a "special injury."[116]

*Tooley* explicitly overruled *Tri-Star* and rejected the "special injury" concept.[117] The court emphasized that the "proper analysis" should focus on "the nature of the wrong and to whom the relief should go," not whether a plaintiff suffered any "special injury."[118]

Nevertheless, the concept reemerged in *Gentile v. Rossette*, which was decided two years after *Tooley*.[119]

In *Gentile*, a corporation's CEO and controlling stockholder forgave a portion of the company's $3 million debt to him in exchange for additional equity that allegedly exceeded the value of the debt.[120] The CEO's equity position in the company rose from 61.19% to 93.49% because of the transaction, and the minority stockholders suffered a corresponding decrease in voting power.[121] Relying on

---

[116] *Id.* ("[A] claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim.").

[117] *See Tooley*, 845 A.2d at 1035 (observing that the "special injury" concept is "amorphous and confusing"); *id.* at 1038 n.21 ("In the *Tri-Star* case, however, this Court lapsed back into the 'special injury' concept, which we now discard.").

[118] *Id.* at 1039.

[119] 906 A.2d 91 (Del. 2006).

[120] *Id.* at 94.

[121] *Id.* at 95.

*Tri-Star*, the *Gentile* court held that the minority stockholders stated a "dual-natured" claim with both direct and derivative characteristics.[122]

The court observed that the plaintiffs' claim was derivative as it pertained to the corporation's "overpayment (or 'over-issuance') of shares to the controlling stockholder."[123] But it concluded that the claim was also direct based on the "unique" harm minority stockholders suffered: the "extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest."[124] The *Gentile* court formulated a test for such "dual-natured" claims:

> A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[125]

In *Brookfield*, the Delaware Supreme Court overruled *Gentile* and abrogated "dual-natured" claims.[126] The court rejected *Gentile*'s focus "on whether one group

---

[122] *Id.* at 100.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 99-100.

[126] *Brookfield*, 261 A.3d at 1277.

25

of stockholders (a controller) was impacted differently from another group (the public or minority holders) as improperly relying on an aspect of *Tri-Star*'s special injury concept."[127] It clarified that "*Tooley*'s first prong instead properly focuses on who suffered the alleged harm and requires that the stockholder demonstrate that he or she has suffered an injury that is not dependent on an injury to the corporation."[128]

Here, the plaintiff asserts that BGC's minority stockholders suffered an injury from the Reorganization—a dilution in voting power—that was not shared by Cantor, the majority stockholder.[129] But his theory draws upon the same "special injury" concept that *Tooley* eliminated.[130] Similarly, the plaintiff maintains that BGC's minority stockholders "suffered reduced voting power by virtue of [Cantor] increasing [its] voting control via the Reorganization."[131] This framing mirrors the

---

[127] *Id.* at 1273.

[128] *Id.*

[129] *See* Pl.'s Answering Br. 20 ("Lutnick suffered no harm from the Reorganization.").

[130] *See Tri-Star*, 634 A.2d at 330 ("A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally . . . ."); *Tooley*, 845 A.2d at 1038 n.21 ("In the *Tri-Star* case, however, this Court lapsed back into the 'special injury' concept, which we now discard."); *see also Brookfield*, 261 A.3d at 1273 ("*Gentile*, by focusing on whether one group of stockholders (a controller) was impacted differently from another group (the public or minority holders), arguably relied on one aspect of *Tri-Star*'s special injury concept.").

[131] Pl.'s Answering Br. 19.

"dual-natured" claim recognized in *Gentile*.[132]  After *Brookfield*, this concept is foreclosed.[133]

### 2. The *Parnes* Exception

The *Brookfield* court confirmed that "[s]tockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation."[134]  The plaintiff asserts that his claim falls into that exception.  He cites to *Parnes v. Bally Entertainment Corp.* and its progeny for the notion that "challenges to the fairness of a merger itself are direct."[135]  Under this precedent, he contends, his claim is "classically direct" because it "attacks the fairness of the series of mergers comprising the Reorganization . . . ."[136]

In *Parnes*, the Delaware Supreme Court observed that stockholder actions attacking the fairness or validity of a merger can be maintained directly.[137]  There, the CEO of a merger target allegedly extracted "substantial sums of money" and

---

[132] *See Gentile*, 906 A.2d at 99-100.

[133] *Brookfield*, 261 A.3d at 1277.

[134] *Id.* at 1272.

[135] Pl.'s Answering Br. 21 & n.79 (citing cases).

[136] *Id.* at 2; *see also id.* at 21 ("Plaintiff challenges the fairness of a series of mergers with an unfair exchange ratio that resulted in the Company's public stockholders suffering a reduction in voting power.").

[137] 722 A.2d 1243 (Del. 1999).

"valuable [target company] assets" from the acquirer during negotiations, despite lacking the authority to demand them.[138] The plaintiff—a former stockholder of the target—alleged that other potential buyers "might have paid a higher price for [the target] but were discouraged from bidding because they were unwilling to participate in illegal transactions."[139]

The court permitted the stockholder, whose derivative standing was extinguished, to pursue a direct claim. It reasoned that "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated."[140]

The plaintiff here draws upon this language from *Parnes*, characterizing his claim as "a challenge to the validity of the [Reorganization] itself."[141] But the exception recognized in *Parnes* is not so broad.[142] As Chief Justice (then-Vice Chancellor) Strine observed, a target stockholder pressing a direct claim under

---

[138] *Id.* at 1245-46.

[139] *Id.* at 1246.

[140] *Id.* at 1245; *see also Chaffin v. GNI Grp., Inc.*, 1999 WL 721569, at *3, 7-8 (Del. Ch. Sept. 3, 1999) (applying *Parnes* to claims challenging target company directors' alleged receipt of "improper personal benefits" that "reduced the consideration received by [the target]'s public shareholders," and holding that the claims were direct).

[141] Pl.'s Answering Br. 21 (quoting *Chaffin*, 1999 WL 721569, at *7).

[142] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *10 (Del. Ch. Sept. 30, 2009) ("Delaware Courts have interpreted the *Parnes* exception very narrowly.").

*Parnes* must "allege facts showing that [a] side payment improperly diverted proceeds that would have, if the defendant directors had acted properly, ended up in the consideration paid to the target stockholders."[143]

The circumstances outlined in the present Complaint stand in stark contrast to scenarios where the *Parnes* exception has applied. The plaintiff—and the BGC minority stockholders he seeks to represent—are not "target" stockholders. Although the relevant transaction was effected through several mergers, BGC was not "acquired." This is a crucial distinction from the *Parnes* line of cases.[144] In an acquisition, the acquiror pays consideration to the target's stockholders in exchange

---

[143] *Golaine v. Edwards*, 1999 WL 1271882, at *9 (Del. Ch. Dec. 21, 1999); *see Blue v. Fireman*, 2022 WL 593899, at * 9 (Del. Ch. Feb. 28, 2022) (distilling the *Parnes* exception as three "gating principles": (1) "[t]he side transaction must divert assets stockholders were otherwise going to receive"; (2) "[t]he side transaction's effect on the merger's price or process must be material, so as to have affected the merger's fairness"; and (3) "the diversion must be improper, as gauged under essentially a merits inquiry, turning on whether the side transaction was a product of misconduct like a breach of fiduciary duty"); *see also Houseman v. Sagerman*, 2014 WL 1600724, at *13 (Del. Ch. Apr. 16, 2014); *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *11 (Del. Ch. June 25, 2018); *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L. Komen Trustee For Komen v. Breyer*, 2020 WL 3484956, at *11 (Del. Ch. June 26, 2020).

[144] *See, e.g.*, *Parnes*, 722 A.2d at 1244 (Hilton's acquisition of Bally); *Chaffin*, 1999 WL 721569, at *3 (399 Venture Partners' acquisition of GNI); *Straight Path*, 2018 WL 3120804, at *7 (Verizon's acquisition of Straight Path); *Oliver v. Boston Univ.*, 2000 WL 1091480, at *5 (Del. Ch. July 18, 2000) (Ligand Pharmaceuticals Inc.'s acquisition of Seragen, Inc.); *Blue*, 2022 WL 593899, at *4 (TPCO Holding Corp.'s acquisition of Left Coast Ventures, Inc.); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *1 (Del. Ch. June 26, 2001) (Nortek, Inc.'s acquisition of Ply Gem Industries, Inc.).

for their shares. In the Reorganization, there was no acquiror paying consideration to the minority stockholders. BGC's corporate structure merely changed.

Further, unlike the cases relied on by the plaintiff, there was no side payment that diverted value from minority stockholders.[145] BGC's purchase of Cantor's LP interests was not a side deal. It was one of two primary exchanges intrinsic to the Reorganization.[146] The additional shares of Class B stock issued to Cantor were not "assets" that BGC's public "stockholders were otherwise going to receive."[147]

---

[145] Pl.'s Answering Br. 19-21 & n.66; *see Parnes*, 722 A.2d at 1245 (describing a side transaction that involved the buyer paying the target's CEO "substantial sums of money," and noting that other potential acquirers "might have paid a higher price" but were unwilling to make side payments to the CEO); *Chaffin*, 1999 WL 721569, at *3 (considering a side transaction that involved the buyer approving cash bonuses and loan forgiveness for certain target company directors); *Oliver,* 2000 WL 1091480, at *5 (addressing a side transaction that involved the buyer paying a "bribe" to the target's controlling stockholders, which "came out of the funds that otherwise would have been paid to plaintiffs and the rest of the purported class"); *Ply Gem*, 2001 WL 755133, at *3 (evaluating a side transaction where the buyer paid $22 million to the target's CEO and forgave his $17 million debt to the company, which led the buyer to reduce the per share price it was willing to by $0.75 to meet the CEO's demands; *Straight Path*, 2018 WL 3120804, at *12, *19 (discussing a side transaction involving the target settling an indemnification claim "potentially worth hundreds of millions of dollars" against its controlling stockholder for only $10 million (plus some proceeds from a sale of assets), which had "the effect of depriving [the target's] stockholders of one-fifth of the merger consideration").

[146] *See supra* notes 66-70 and accompanying text.

[147] *Blue*, 2022 WL 593899, at *9.

30

There was no sale of the company, change of control, or diversion of consideration from the minority. BGC public stockholders sold nothing.[148] They retained derivative standing after the Reorganization.[149] The *Parnes* exception is inapplicable in these circumstances.

### 3. *Brookfield*'s Application

Finally, the plaintiff strives to distinguish *Brookfield* by arguing that it is limited to the specific context of a corporation "raising capital by issuing new equity."[150] Not so. Delaware courts have interpreted *Brookfield* to hold that dilution claims are derivative, regardless of the nature or purpose of the underlying transaction.[151]

The plaintiff recognizes that *Brookfield* applies to "assets-for-stock" cases.[152] He argues that his claim is nevertheless direct because the Reorganization did not

---

[148] The *Tooley* analysis can take on heightened significance in the post-merger context, where stockholders "typically lose standing to pursue derivative claims when a merger extinguishes their status." *Komen*, 2020 WL 3484956, at *7; *see also Blue*, 2022 WL 593899, at *5. That is not the case here.

[149] *See infra* Section II.C.

[150] Pl.'s Answering Br. 25; *see also id.* at 3 ("Unlike the private placement in *Brookfield*, the Reorganization was not effectuated to fundraise by issuing new equity.").

[151] *See, e.g.*, *New Enter. Assocs.*, 292 A.3d at 156 ("[T]he Delaware Supreme Court h[eld] definitively that claims for equity dilution are only and always derivative."); *Erisman v. Zaitsev*, 2021 WL 6134034, at *15 & n.152 (Del. Ch. Dec. 29, 2021) (applying *Brookfield* in holding that a dilution claim arising from an LLC's issuance of new units to a target as merger consideration was derivative, and noting that "dilution claims are exclusively derivative").

[152] Pl.'s Answering Br. 25.

involve an exchange of assets for stock.[153] Instead, he insists, the relevant exchange involved Cantor taking voting power from BGC's minority stockholders without giving them anything in return.[154] This is a mischaracterization of the Reorganization.

The Reorganization involved BGC exchanging additional Class B shares for Cantor's LP units—and its consent to the Reorganization.[155] Cantor also gave up certain benefits and contractual rights it enjoyed under the Up-C structure.[156] Cantor's LP interests (and the associated benefits) are the "assets" it relinquished in exchange for additional Class B shares.[157] The plaintiff's claim, then, hinges on

---

[153] *Id.* at 26 ("Old BGC did not pay—let alone overpay—for any assets in granting Cantor increased voting power."); *id.* at 18 ("[T]he Company did not pay Lutnick for *any* assets in connection with the Reorganization").

[154] *Id.* at 18 ("Old BGC stockholders (including Plaintiff and the Class) suffered a reduction in their voting power in the post-Reorganization Company without obtaining adequate consideration."); *id.* at 23 (distinguishing the Reorganization from a "*Revlon* sale process"); *see also supra* note 103 and accompanying text (noting that the Complaint seeks damages and relief on behalf of New BGC).

[155] *See supra* note 29 and accompanying text (noting that Cantor's consent was required); Compl. ¶¶ 61-62.

[156] *See supra* notes 8, 30 and accompanying text (discussing the tax consequences of BGC Holdings being a pass-through entity and the contractual rights Cantor had in BGC Holdings); *see also* Proxy 59 ("Cantor could bear additional taxes because this equity stake would be in a corporation that pays taxes . . . as opposed to a partnership with pass-through taxation; and . . . distributions from BGC Holdings to its limited partners are mandatory whereas distributions from the holding company to its stockholders would be subject to board approval.").

[157] *See, e.g.*, *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) ("The rights arising out of contracts have long been recognized as property rights."); *Delaware Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 327-28 (Del. Ch.

whether BGC gave Cantor too many Class B shares—that is, whether it overpaid

Cantor—in exchange.

*Brookfield* is on point. It decisively confirms that the plaintiff's claim is

derivative under the *Tooley* test.

## C. Demand Futility

The plaintiff was not deprived of derivative standing when the Reorganization

closed.[158] The Reorganization amounted to a "corporate reshuffling."[159] It

---

2006) (holding that stockholders who were "involuntarily deprived of . . . the favorable tax treatment that accompanies [a pass-through entity]" as a result of a squeeze-out merger "should receive compensation for those expected benefits").

[158] *See Lewis v. Ward*, 852 A.2d 896, 901-02 (Del. 2004) (recognizing that derivative standing survives post-merger "if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise" (citation omitted)); *see also Schreiber v. Carney*, 447 A.2d 17, 22 (Del. Ch. 1982) (holding that a plaintiff whose shares were exchanged in a reorganization for shares in a newly-created holding company retained derivative standing because "the merger had no meaningful effect on the plaintiff's ownership of the business enterprise" and the "structure of the old and new companies [was] virtually identical"); *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) (applying the reorganization exception when "corporate reshuffling" did not result in changes in the parties' "economic interests"); *Harris v. Harris*, 2023 WL 115541, at *11 (Del. Ch. Jan. 6, 2023) (applying the reorganization exception when the transaction "can be regarded as the epitome of a corporate reshuffling," which involved the company merging into a newly-created shell corporation, and the surviving entity "held only the assets that the Company brought to the transaction").

[159] *See Lewis*, 852 A.2d at 904 (pointing to "equitable concerns that have caused Delaware courts to allow a plaintiff [derivative] standing following a mere corporate reorganization"). The plaintiff seems to acknowledge as much by using the term "Reorganization" in his Complaint to describe the Up-C conversion. *See, e.g.*, Compl. 1 (defining the corporate conversion transaction as the "Reorganization"); *cf. Komen*, 2020 WL 3484956, at *15 (declining to apply the reorganization exception when "the Complaint d[id] not allege that [a] spinoff was a mere reorganization").

33

"reorganize[d] and simplif[ied] the organizational structure of the BGC entities."[160] Class A stockholders' economic interests were unchanged.[161]

To maintain his derivative claim, the plaintiff must satisfy Rule 23.1. Because he did not make a pre-suit demand on BGC's Board, he must establish that a demand on the BGC Board would have been futile.[162] He made no attempt to do so.[163]

## III. CONCLUSION

The plaintiff's claim is derivative under *Tooley*. He did not make a demand on BGC's Board. He did not plead demand futility. The Complaint is therefore dismissed under Rule 23.1.

---

[160] Proxy 2.

[161] Compl. ¶ 112 (quoting Houlihan's final presentation to the Joint Committee, which stated that the Reorganization was "value neutral" to public stockholders); *cf. In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 474 (Del. 2024) (declining to apply the reorganization exception because the transaction left the "public stockholders holding equity in a company with different ownership and inferior assets than the company in which they chose to invest" (citation omitted)).

[162] *See* Ct. Ch. R. 23.1; *see also United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058-59 (Del. 2021) (setting out the three-part demand futility test that the court must apply).

[163] The plaintiff chose not to amend his complaint after the defendants argued that his Complaint lacked any demand futility allegations.

34